[No. C023075. Third Dist. Apr. 10, 2000.]

CALIFORNIA ASSOCIATION OF PROFESSIONAL SCIENTISTS et al.,
Plaintiffs and Respondents, v.
DEPARTMENT OF FISH AND GAME et al., Defendants and
Respondents;
ALBERT W. MILLS et al., Interveners and Appellants.

[No. C023184. Third Dist. Apr. 10, 2000.]

ALBERT W. MILLS, Plaintiff and Appellant, v.
DEPARTMENT OF FISH AND GAME et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I.

938

## COUNSEL

McNeill & Belton and Walter P. O'Neill for Plaintiff and Appellant and for Interveners and Appellants.

Robin L. Rivett, Sharon L. Browne and Anne M. Hawkins for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV and Marian E. Moe, Deputy Attorneys General, for Defendants and Appellants and for Defendants and Respondents.

Dennis F. Moss for Plaintiffs and Respondents.

## OPINION

**RAYE, J.**—In this appeal we consider whether the Legislature ran afoul of the supermajority requirement of article XIII A of the California Constitution when it imposed a flat fee per environmental review by the Department

of Fish and Game (Fish and Game). More precisely, we must determine whether the exactions imposed by section 711.4 of the Fish and Game Code[1] constitute a regulatory fee or a tax.

Determining whether an exaction is a fee or a tax has been a recurring chore since 1978 when the voters in California enacted comprehensive and constitutional tax reform. (Cal. Const., art. XIII A (the Jarvis-Gann Property Tax Initiative or Proposition 13).) An act to increase state taxes must be passed by two-thirds of the members of the Legislature and an increase in local taxes must be passed by a two-thirds vote of the qualified electors. (Cal. Const., art. XIII A, §§ 3 & 4.) Fees, by contrast, are not subject to the supermajority limitation of article XIII A. Albert Mills, an appellant in both cases, insists the environmental review fees charged by Fish and Game pursuant to section 711.4 constitute a tax and, therefore, are unconstitutional because the statute was passed by slightly less than a two-thirds majority.

It is well established that the amount of fees collected must not surpass the cost of the regulatory services or programs they are designed to support. We must decide whether there must be a direct correlation between the amount of a fee imposed on a specific payor and the benefits received or burdens imposed by the payor's activity. More to the point, is a flat regulatory fee in legal effect a tax subject to the supermajority requirement of California Constitution, article XIII A?

We conclude that as long as the cumulative amount of the fees does not surpass the cost of the regulatory program or service and the record discloses a reasonable basis to justify distributing the cost among payors, a fee does not become a tax simply because each payor is required to pay a predetermined fixed amount. Flat fees are not in legal effect taxes. Based on the evidentiary record before us, we find that the Legislature did not violate California Constitution, article XIII A by imposing a flat regulatory fee on those who submit project proposals to Fish and Game for the environmental review necessary to protect fish and wildlife. The consequences of our ruling to the multiple parties in these consolidated cases are explained below.

PROCEDURAL BACKGROUND

Section 711.4, enacted by the Legislature in 1990, set a fee schedule to defray a portion of the costs incurred by Fish and Game in meeting its environmental review obligations under the California Environmental Quality Act and the Z'Berg-Nejedly Forest Practice Act of 1973. (§ 711.4,

---

[1]Further statutory references to sections of an undesignated code are to this code.

subds. (a), (b), (c) & (d); Pub. Resources Code, §§ 4511, 21000 et seq.) Section 711.4 states in relevant part: "(a) The department shall impose and collect a filing fee in the amount prescribed in subdivision (d) to defray the costs of managing and protecting fish and wildlife trust resources, including, but not limited to, consulting with other public agencies, reviewing environmental documents, recommending mitigation measures, developing monitoring requirements for purposes of the California Environmental Quality Act . . . , consulting pursuant to Section 21104.2 of the Public Resources Code, and other activities protecting those trust resources identified in the review pursuant to the California Environmental Quality Act. [¶] (b) The filing fees shall be proportional to the cost incurred by the department and shall be annually reviewed and adjustments recommended to the Legislature in an amount necessary to pay the full costs of department programs as specified." For projects for which a negative declaration has been prepared, the filing fee set by the Legislature is $1,250 and for projects for which an environmental impact report has been prepared, the filing fee is $850. (§ 711.4, subd. (d)(3) & (4).) "The county clerk may charge a documentary handling fee of twenty-five dollars ($25) per filing in addition to the filing fee specified in subdivision (d)." (§ 711.4, subd. (e).)

Albert W. Mills challenged the constitutionality of section 711.4 in a declaratory relief action he filed in July 1991. He sought declaratory and injunctive relief in a first cause of action and a refund of his fees in a second cause of action. A demurrer was sustained without leave to amend to the second cause of action. Fish and Game sought a writ of mandate to compel the trial court to dismiss the entire complaint because Mills had not filed a claim for a tax refund. We summarily denied the petition for the writ. The trial court denied a subsequent motion for judgment on the pleadings on the same ground asserted in the writ petition.

In 1992 the Legislature amended the statute to expand the exemptions for projects for which no fees were required. The amendment passed by a two-thirds majority vote.

The case was tried in the summer of 1994 and the following spring the trial court issued a statement of decision. The court found that although the statute was not unconstitutional on its face, on the evidence received by the court, it was unconstitutionally applied. Before the statement of decision was filed and a judgment was entered, the parties settled the lawsuit. Fish and Game agreed to refund Mills's fees, to pay his attorney fees, and to cease collection of the fees statewide.

Employees of Fish and Game, however, filed a petition for a writ of mandate to compel Fish and Game to resume collection of the fees and to

pursue retroactive collection. Mills intervened in the writ proceedings, which were then consolidated with the declaratory relief action.

The trial court again ruled that section 711.4 was unconstitutional as applied but that, in the absence of an appellate finding that the statute was unconstitutional, the ruling could only be applied to Mills. (Cal. Const., art. III, § 3.5.) The court ordered Fish and Game to reinstate enforcement and to retroactively collect the fees. The settlement order in the declaratory relief action was modified to conform to the judgment in the writ proceedings. The settlement order provides in pertinent part that section 711.4 is not unconstitutional on its face but is unconstitutional as applied to Mills; Fish and Game is enjoined from collecting fees from Mills but is not otherwise prohibited from collecting fees.

Mills appeals both judgments. On appeal from the judgment in the declaratory relief action, he maintains section 711.4 is unconstitutional on its face and, consequently, Fish and Game must be enjoined from collecting all fees. Fish and Game urges us to dismiss the appeal on multiple grounds: Mills lacks standing because, under the terms of the settlement, he is not aggrieved; the constitutionality of section 711.4 is moot because it was amended by a two-thirds majority; and the trial court lacked jurisdiction because Mills failed to exhaust his administrative remedies by filing a claim for a tax refund. Fish and Game also appeals. We granted the Pacific Legal Foundation's request to file an amicus curiae brief echoing Mills's constitutional attack on the statute.

For the reasons discussed herein, we affirm in part and reverse in part the judgment entered in the declaratory relief action. Because we have concluded that section 711.4 is a valid regulatory fee, and was therefore constitutionally enacted, Mills's appeal from the judgment entered in the writ proceedings is moot. That appeal is dismissed.

DISCUSSION

I*

. . . . . . . . . . . . . . . . . . . . . . . . .

II

Before we apply the ever-growing body of case law involving post-Proposition 13 fees and taxes, it is essential to understand the statutory world

---

*See footnote, *ante*, page 935.

in which Fish and Game lives and section 711.4 was born. The language of these statutes resolves some of the issues raised by Mills and provides the necessary background to analyze others.

Mills argues that Fish and Game does not operate a regulatory program and, therefore, the fee is not regulatory in nature. We disagree. Fish and Game is only one small part of a huge regulatory system in place in this state to protect and sustain the environment, but it plays a vital regulatory role under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.) CEQA guidelines specifically list Fish and Game as a trustee agency, a status which imposes certain obligations. Fish and Game must be consulted before a determination is made as to whether a negative declaration or an environmental impact report is required for a particular project. (Pub. Resources Code, § 21080.3, subd. (a).) If an environmental impact report is required, Fish and Game must comment as to the scope and contents of this document. (Pub. Resources Code, § 21080.4, subd. (a).) Later in the process, Fish and Game may be required to submit a proposed program to monitor the mitigation measures. (Pub. Resources Code, § 21081.6.) The same obligations are imposed by documents which function as environmental assessment documents such as timber harvest plans. (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 626 [216 Cal.Rptr. 502].) Fish and Game Code section 1802 also requires Fish and Game to consult with lead and responsible agencies.

Fish and Game also has comparable obligations under the Forest Practice Act. (Pub. Resources Code, § 4511 et seq.) Like the responsibility conferred on it under CEQA, Fish and Game must review the impact of a timber harvest plan on fish and wildlife. The Department of Forestry and Fire Protection cannot approve a timber harvest plan until it has consulted with Fish and Game. (Pub. Resources Code, § 4582.6.)

Under both CEQA and the Forest Practice Act, Fish and Game is an essential link in a comprehensive attempt to safeguard the environment. The fact that Fish and Game does not operate an independent regulatory program with a correlative accounting system does not detract from its regulatory role. The law is not so narrowly drawn. In a similar vein, the court in *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866 [64 Cal.Rptr.2d 447, 937 P.2d 1350] observed: "From the viewpoint of general police power authority, we see no reason why statutes or ordinances calling on polluters or producers of contaminating products to help in mitigation or cleanup efforts should be deemed less 'regulatory' in nature than the initial

permit or licensing programs that allowed them to operate. Moreover, imposition of 'mitigating effects' fees in a substantial amount . . . also 'regulates' future conduct by deterring further manufacture, distribution, or sale of dangerous products, and by stimulating research and development efforts to produce safer or alternative products." (*Id.* at p. 877.)

Having charged Fish and Game with the responsibility to manage and protect fish and wildlife through the environmental review process, the Legislature enacted a fee statute to fund Fish and Game's review functions. There are two parts of section 711.4 which are germane to the constitutional question before us.

The Legislature expressly addressed proportionality. Section 711.4, subdivision (b) states: "The filing fees shall be proportional to the cost incurred by the department and shall be annually reviewed and adjustments recommended to the Legislature in an amount necessary to pay the full costs of department programs as specified."

Although the Legislature mandated a flat fee financing mechanism, it also provided an exemption for those projects with a de minimis impact on fish and wildlife. Section 711.4, subdivision (d)(1) provides: "For a project which is found by the lead or certified regulatory agency to be de minimis in its effect on fish and wildlife, no filing fee shall be paid, whether or not a negative declaration or an environmental impact report is prepared pursuant to the California Environmental Quality Act." In fact, 68 percent of the projects are found to be de minimis and a fee is not required.

In sum, the Legislature has given Fish and Game a critical regulatory role in the complex regulatory structure created to safeguard precious environmental resources. At the same time, the Legislature created a flat fee system to finance Fish and Game's environmental review. That system, by statute, must be proportional to the overall cost of environmental review, but only those who propose development projects which have more than a de minimis impact upon fish and wildlife are required to bear the cost of review. We must determine whether the Legislature violated the Constitution by establishing such a fee system with less than a two-thirds vote.

III

In 1991 the Legislature enacted the Childhood Lead Poisoning Prevention Act to provide evaluation, screening, and follow-up services for children who were at risk of suffering lead poisoning. The program of screening and treatment under the act was to be paid entirely by fees paid by those who

contributed to lead contamination. In *Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th 866, the Supreme Court concluded the act imposed bona fide regulatory fees, not taxes.

*Sinclair* is the first published case in the post-Proposition 13 era to consider whether a state, rather than a local, fee is in legal effect a tax. "Section 3 of article XIII A restricts the enactment of changes in state taxes, as follows: 'From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members . . . of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed.' " (*Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at pp. 872-873.) By contrast, there have been an abundance of cases in which courts have struggled to characterize a local exaction as a fee or a "special tax" under California Constitution, article XIII A, section 4. In *Sinclair,* the Supreme Court announced that "[b]ecause of the close, 'interlocking' relationship between the various sections of article XIII A" the section 4 cases "may be helpful, though not conclusive" in deciding cases under section 3. (15 Cal.4th at p. 873.)

The court also reiterated the fundamental principle that "whether impositions are 'taxes' or 'fees' is a question of law for the appellate courts to decide on independent review of the facts." (*Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at p. 874.) Ordinarily, "taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted" and "[m]ost taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges." (*Id.* at pp. 873-874.)

*Sinclair* was particularly helpful in identifying three very different kinds of fees or assessments, viz. special assessments, development fees and regulatory fees. (See also *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 596 [77 Cal.Rptr.2d 752].) As the court pointed out, special assessments are based on the value of benefits conferred on property, and development fees are exacted in return for permits or other government privileges. Regulatory fees, enacted under the police power, are an entirely different animal. The parties have failed to distinguish between these types of fees and, consequently, have extracted general principles from cases involving one type of fee and applied them to cases involving a completely different type of fee. We have focused our research on those cases, like *Sinclair,* involving regulatory fees.

 General principles have emerged. Fees charged for the associated costs of regulatory activities are not special taxes under an article XIII A, section 4 analysis if the " ' "fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and [they] are not levied for unrelated revenue purposes." ' " (*Sinclair Paint Co. v. State Bd. of Equalization, supra,* 15 Cal.4th at p. 876; *Townzen v. County of El Dorado* (1998) 64 Cal.App.4th 1350, 1359 [76 Cal.Rptr.2d 281].) "A regulatory fee may be imposed under the police power when the fee constitutes an amount necessary to carry out the purposes and provisions of the regulation." (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1146, fn. 18 [250 Cal.Rptr. 420].) "Such costs . . . include all those incident to the issuance of the license or permit, investigation, inspection, administration, maintenance of a system of supervision and enforcement." (*United Business Com. v. City of San Diego* (1979) 91 Cal.App.3d 156, 165 [154 Cal.Rptr. 263].) Regulatory fees are valid despite the absence of any perceived "benefit" accruing to the fee payers. (*Pennell v. City of San Jose* (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111], affd. on other grounds *sub nom. Pennell v. City of San Jose* (1988) 485 U.S. 1 [108 S.Ct. 849, 99 L.Ed.2d 1].) Legislators "need only apply sound judgment and consider 'probabilities according to the best honest viewpoint of informed officials' in determining the amount of the regulatory fee." (*United Business Com. v. City of San Diego, supra,* 91 Cal.App.3d at p. 166.)

The government bears the burden of proof. (*Beaumont Investors v. Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 235 [211 Cal.Rptr. 567].) It must establish (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity. (*Id.* at pp. 234-235.) "Courts [look] to a variety of evidence in determining whether the agency has satisfied that burden, not all of it prepared before the adoption of the ordinance." (*City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264, 282 [17 Cal.Rptr.2d 845].)

*City of Dublin v. County of Alameda, supra,* 14 Cal.App.4th 264, provides guidance on the quantum of proof necessary to establish the requisite fee-cost ratio. By initiative, the voters in Alameda County enacted a comprehensive recycling plan. Under the law, the plan was to be funded from a recycling fund created by a $6 per ton surcharge on materials dumped in the county landfills. The issue presented was whether the evidence before the trial court established that the surcharge would not exceed the reasonably

necessary costs of the programs it would fund. The Court of Appeal considered both the estimated costs of the programs and the basis for determining the apportionment of those costs.

The court wrote: "The trial court concluded that the requisite fee-cost relationship was not established because Measure D's programs are not yet developed and their costs cannot presently be calculated with certainty, but such specificity is not required. Instead, the record need only demonstrate a reasonable relationship between the fees to be charged and the *estimated* cost of the service or program to be provided; that requirement may be satisfied by evidence showing only that the fees will generate substantially less than the anticipated costs." (*City of Dublin v. County of Alameda, supra*, 14 Cal.App.4th at p. 283, original italics.)

In a similar case, the Court of Appeal addressed the quantum of proof and proportionality. "Plaintiffs fault the report for failing to include 'site-specific' data showing a 'close connection' between new development and the fees to be imposed. However, their citation to 'taking' cases shows that they are blurring legal principles. [Citation.] The fee at issue here is a general one applied to all new residential development and valid if supported by a reasonable relationship between the amount of the fee and estimated cost of services. Site-specific review is neither available nor needed." (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 333-334 [4 Cal.Rptr.2d 897].)

Fish and Game met its burden of showing that the amount of fees generated by section 711.4 was far less than the cost of the environmental reviews provided. There was evidence that $11 million had been collected in fees, but the cost of the reviews was in excess of $20 million. Thus, the fees were not revenue raising in that they did not generate income which surpassed the cost of the services provided.

The more difficult issue is determining what latitude the Legislature has in establishing the amount of a fee imposed on an individual payor. Fish and Game argues the fees have no indicia of a tax. Since there is sufficient evidence to demonstrate that collectively the amount of the fees do not exceed the cost of the regulatory program they are collected to support, they urge us to uphold the constitutionality of section 711.4. Mills, on the other hand, insists Fish and Game failed to prove the more specific requirement that the fees are proportionate to the service provided or the burden imposed. He insists the flat fee is a tax because there is no individual correlation between the amount of the fee and the cost of the benefit or burden. Whether the Legislature retains the flexibility to mandate a flat fee by a simple majority vote is the crux of this case.

*Sinclair* is noteworthy for its expansive legitimation of regulatory fees. Under the formula approved by the Supreme Court, paint manufacturers are assessed fees based on their market share or their past and present responsibility for environmental lead contamination. (*Sinclair Paint Co. v. State Bd. of Equalization, supra*, 15 Cal.4th at p. 872.) Market share is a novel methodology for assessing fees. Nevertheless, the court permitted present fees to be determined on the basis of past conduct when not only were fees nonexistent, but the dangers of lead-based paint were unknown.

As broad as the implications of *Sinclair* are, the Supreme Court did not have to reach the troublesome issue of proportionality, because paint manufacturers were assessed fees in proportion to their share of the market. Moreover, Sinclair, in moving for summary judgment, did not seek to establish that the amount of the fees bore no reasonable relationship to the social or economic burdens its operations generated. The court noted that Sinclair would have the opportunity at trial "to try to show that no clear nexus exists between its products and childhood lead poisoning, or that the amount of the fees bore no reasonable relationship to the social or economic 'burdens' its operations generated." (*Sinclair Paint Co. v. State Bd. of Equalization, supra*, 15 Cal. 4th at p. 881.)

Close to 20 years ago, we articulated the same rule to Mills in his earlier constitutional challenge to fees charged for processing land use applications. In *Mills v. County of Trinity* (1980) 108 Cal.App.3d 656 [166 Cal.Rptr. 674], we stated: " '[T]he special tax' referred to in section 4 of article XIII A does not embrace fees charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes." (*Id.* at pp. 659-660.) In *Mills* as in *Sinclair*, however, the case was remanded "for a factual determination of whether the fees in question are reasonably compensatory for the costs occasioned by the regulated activities." (*Mills*, at p. 660.)

Flat regulatory fees were upheld in *Pennell v. City of San Jose, supra*, 42 Cal.3d 365. In *Pennell*, a rent control ordinance imposed a flat annual fee on each rental unit. It was "designed to defray the costs of providing and administering the hearing process prescribed in the ordinance, not to pay general revenue to the local government." (*Id.* at p. 375.) The court concluded: "It is well settled that a municipality under the police power may impose a regulatory fee when, as here, the fee constitutes an amount necessary to carry out the purpose and provisions of the regulation." (*Id.* at p. 375, fn. 11.)

The court in *Pennell* appeared satisfied that the cumulative amount of the fee would support the administration and implementation of the hearing process without an examination of the benefits to be derived by individual lessees. Many lessors would never avail themselves of the hearing process at all and yet under the rent control ordinance, they, like the lessees who would petition for hearing, were required to pay the fee. *Pennell* does not require the government to prove proportionality on an individual basis. Under *Pennell,* the significant inquiry is whether the amount of the fees collected under the ordinance exceed the cost of the regulatory program they are collected to support. Proportionality is measured collectively to assure that the fee is indeed regulatory and not revenue raising.

While Mills cites many cases for the general proposition that fees must be apportioned according to some formula for ascertaining the benefits received or the burdens imposed by the payor's activity, he fails to cite a single regulatory fee case in which a fee was found to be a tax because the government failed to sustain its burden of proving a reasonable apportionment. On this pivotal point, the cases require close examination for what they require and for what they do not.

Two cases involve regulatory fees, like those before us, enacted to defray the costs of programs to mitigate damage to the environment. In *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist., supra,* 203 Cal.App.3d 1132 (*San Diego Gas & Electric Co.*), and *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178 [29 Cal.Rptr.2d 128], the Courts of Appeal upheld fee structures against challenges they constituted special taxes. Both cases discuss the apportionment issue at some length.

In *San Diego Gas & Electric Co., supra,* a utility company challenged an air pollution district's method of apportioning the costs of its permit programs by apportioning them among all monitored polluters according to a formula based on the amount of emissions discharged by a stationary pollution source. The emissions-based formula allowed the district to charge additional renewal permit fees based on the average pollution generated by a facility within a specific industry. The court wrote: "SDG&E argues the district has not specifically shown how the amount of emissions generated by a pollution source increase the district's indirect costs . . . . There is no reason to require the district to show precisely how more emissions generate more costs to justify the emission-based apportionment formula. The purpose for the district's existence is to achieve and maintain air quality standards (§ 40001), thus from an overall perspective it is reasonable to allocate costs based on a premise that the more emissions generated by a

pollution source, the greater the regulatory job of the district." (203 Cal.App.3d at pp. 1147-1148, fn. omitted.)

In rejecting *San Diego Gas & Electric Co.*'s argument that the emissions-based formula eroded the intent of the voters in enacting California Constitution, article XIII A, the court explained that "Proposition 13's goal of providing effective property tax relief is not subverted by the increase in fees or the emissions-based apportionment formula. A reasonable way to achieve Proposition 13's goal of tax relief is to shift the costs of controlling stationary sources of pollution from the tax-paying public to the pollution-causing industries themselves, an accomplishment of the 1982 amendments to [Health and Safety Code] section 42311 and the emissions-based fee schedule." (*San Diego Gas & Electric Co., supra,* 203 Cal.App.3d at pp. 1148-1149.)

In *Brydon,* water customers challenged a new rate structure as a special tax. The inclined rate structure increased price per cubic foot for increased usage. The Court of Appeal found *San Diego Gas & Electric Co.* "a sustainable analogy." "Just as the regulatory scheme set forth by the [air pollution control district] was designed to achieve a legislatively mandated ecological objective, so is the inclined block rate structure of the District a response to state-mandated water-resource conservation requirements." (*Brydon v. East Bay Mun. Utility Dist., supra,* 24 Cal.App.4th at p. 192.) The court emphasized the latitude necessary to set the amount of fees to meet the regulatory objectives. "In pursuing a constitutionally and statutorily mandated conservation program, cost allocations for services provided are to be judged by a standard of reasonableness with some flexibility permitted to account for system-wide complexity. [Citation.] [¶] . . . [¶] . . . In short, California Constitution, article XIII A does not apply to every regulatory fee simply because, as applied to one or another of the payor class, the fee is disproportionate to the service rendered." (*Id.* at pp. 193-194.)

Hence, both cases narrow the breadth of California Constitution, article XIII A as applied to regulatory fees. Both suggest a flexible assessment of proportionality within a broad range of reasonableness in setting fees. In *San Diego Gas & Electric Co.,* the use of a formula to distribute indirect costs was sustained, while in *Brydon* an inclined block rate schedule allowed the water district to discourage water consumption. Neither relied on the kind of exact apportionment calculation urged by Mills.

Still, *San Diego Gas & Electric Co.* and *Brydon,* unlike *Pennell,* did not involve flat fees. While the formula or rate structure may not have been exact, each bore some relationship to the benefit reaped or the burden

imposed by the payor. Put another way, the payors had some control over the amount of the regulatory fee they were compelled to pay by the degree to which their respective activities impacted the environment. The more they polluted the air and consumed the water, the more they paid.

We acknowledge that in this case Mills had no comparable control over the amount of the fees he was charged to review his timber harvest plan. The amount of the fees is expressly set forth in section 711.4. ■ Neverthe- less, we hold that a regulatory fee, to survive as a fee, does not require a precise cost-fee ratio. A regulatory fee is enacted for purposes broader than the privilege to use a service or to obtain a permit. Rather, the regulatory program is for the protection of the health and safety of the public. The legislative body charged with enacting laws pursuant to the police power retains the discretion to apportion the costs of regulatory programs in a variety of reasonable financing schemes. An inherent component of reason- ableness in this context is flexibility. We agree with the notion that shifting the costs of environmental protection to those who seek to impact our natural resources does not subvert the objectives embodied in Proposition 13. Hence, a regulatory fee does not violate California Constitution, article XIII A when the fees collected do not surpass the costs of the regulatory programs they support and the cost allocations to individual payors have a reasonable basis in the record.

IV

■ The record before us is a vivid illustration of the need for flexibility in establishing the amount of regulatory fees. Regulatory fees, unlike other types of user fees, often are not easily correlated to a specific, ascertainable cost. This may be due to the complexity of the regulatory scheme and the multifaceted responsibilities of the department or agency charged with implementing or enforcing the applicable regulations; the multifaceted re- sponsibilities of each of the employees who are charged with implementing or enforcing the regulations; the intermingled functions of various depart- ments as well as intermingled funding sources; and expansive accounting systems which are not designed to track specific tasks.

Mills asserts that these problems preclude a finding of a fee. He points out that Fish and Game did not conduct the kind of study now accepted within the expert field of user fee analysis to ascertain with precision the justifiable amount of a proposed fee based on the costs involved in providing the service. He criticizes the change in accounting systems in July 1991 which obfuscates the data necessary to make credible calculations, and he bemoans

the incomprehensibility of the new CALSTARS accounting system as it relates to a user fee analysis. He insists that depositing the fees into Fish and Game's preservation fund is tantamount to a tax since the preservation fund operates as a general fund for Fish and Game. And he provides many examples of how disproportionate the fees are as to certain payors. Although most projects only receive a cursory review, there is a substantial variance in the amount of time spent on more in-depth reviews, varying from a few minutes to a few weeks, with the burden falling most heavily on small timberland owners.

This evidence is undisputed. There is no question that a flat fee will seldom represent the exact cost of providing a service. Fish and Game does not pretend such a correlation exists. Since we have determined that state regulatory fees are different from other user fees, the question presented is whether the evidence in this record is sufficient to sustain the legislative determination that a flat fee system is a reasonable means to allocate the costs of environmental review.[3]

Mills fails to appreciate the difference between regulatory fees and more typical user fees. At trial, he offered an expert from the new cottage industry of analysts and advisers to local governments on how to legitimize their fees in the litigious climate spawned by Proposition 13. That expert's testimony reflects his misguided assumption that all fees are created equal and that, to survive constitutional attack, they must be supported by exhaustive studies, unassailable time keeping, and a precise cost-fee analysis.

He insisted that a cost analysis study was not only advisable, but necessary. "So that is why I am saying it is possible for Fish and Game to do a kind of cost analysis study. My question then would be, secondly, do they now have that in place? Have they kept track? Have they required their staff to fill in reports? I mean, they might be able to do it starting now. But have they done it? Nothing has been submitted to me showing a tracking process of the steps taken and breaking down the specific tasks and functions.

"I recall this being referenced to the fact the administrative or bookkeeping costs were too high to do that. Frankly, my judgment is that becomes a

---

[3]Evidence of the legislative history of section 711.4 was admitted at trial. Legislative history can be relevant to a determination whether an exaction is a fee or a tax. (*Centex Real Estate Corp. v. City of Vallejo* (1993) 19 Cal.App.4th 1358, 1362 [24 Cal.Rptr.2d 48].) Here, the trial court found the costs of environmental review exceeded the amount of the fees, but it found imposition of a flat fee arbitrary. Without the benefit of the Supreme Court's holding in *Sinclair* and the broad analysis of regulatory fees, the trial court narrowly construed section 711.4 as a user fee requiring the amount of the fees to reflect the cost of the service provided the payor. Because we have decided that a flat fee may be a reasonable allocation of the costs of a regulatory fee and the trial court found Fish and Game had met its burden of proof on this issue, the legislative history cited by the trial court is unnecessary.

cop-out. It is not too difficult. You can organize and set up, especially in today's computerized world with P.C.'s on half the staff desks.

"Attorneys have to bill by the minutes. They have to keep track of their time.

"It is perfectly possible to keep track of time. And I think, frankly, my judgment might be that if it is difficult, if your staff are not now doing those things systematically, it needs a whole retraining and regearing."

He opined that absent retraining, regearing, studies, and analysis, a fee could not survive a constitutional challenge. He went on to suggest a rather unique correlation between the time spent and the benefits achieved. Having testified he could not find a direct relationship between payment of a fee and providing any service, he stated: "There is no discussion of what happens as a result of the reviews. You know, do more spotted owls get saved? More fish saved? Or what. There is no functional relationship." Again he opined that in order to sustain the constitutionality of the fee, Fish and Game must document how a forest was saved or how many spotted owls were saved by the staff.

Fish and Game urges us to dismiss his opinion for several reasons: He had never reviewed the data supporting imposition of a state fee, he did not conduct any study to determine whether the section 711.4 flat fees were reasonable or proportional, and he had no familiarity with CEQA or the regulatory landscape in which Fish and Game must operate, not to mention that his proffered opinion constituted an inadmissible conclusion of law.

We need not address these specific deficiencies because we believe his testimony serves to highlight the fundamental distinction between a user fee and a regulatory fee. His testimony is predicated on many faulty assumptions based on user fees when there is an obvious correlation between cost and benefit. Moreover, in many cases, a statute demands that the amount of a fee be commensurate with the value of a service provided or the cost of a burden imposed. (See, e.g., Gov. Code, §§ 50076, 66001.) No comparable statutes apply to this state-imposed regulatory fee.

From the vantage point of one who earns a living studying user fees and counseling local governments on how to insulate their fees from constitutional attack, it is not surprising he would overlook the vast discrepancy between a fee imposed or a privilege accorded an individual and a fee that apportions and distributes the collective costs of a regulation. In the latter case, the many factors this expert described as deficiencies become the

reasonable justification for imposing a flat fee. That is, the Legislature may have determined that the administrative cost and burden of a statewide fee, including expensive studies and accounting, was too high when a simpler, flat fee could be imposed. Moreover, often, as here, measuring the benefits is amorphous. The Legislature could reasonably eschew a graduated fee structure based on an accounting of owls that were spared and forests that survived. He failed to understand that a legislative body in determining the amount of a regulatory fee is legitimately hampered by the many factors he describes as necessary to support a user fee.

The Legislature determined that the fee must be paid when a notice of determination is entered. Mills argues the timing of the exaction is unfair and unreasonable because many payors pay for reviews they never receive and others receive a bargain price for an extensive and time-consuming study. It is not our role to assess the wisdom of legislation from either a public policy or public relations perspective. We are asked only to determine whether section 711.4 imposes a fee or a tax. The record discloses several reasonable justifications for imposing a flat fee.

Fish and Game offered testimony that the imposition of an hourly fee for any environmental review would discourage early consultation. Often developers contact Fish and Game to discuss potential adverse impacts of a proposed project before any plans are submitted. Fish and Game then has the opportunity to engage in a collaborative process to eliminate or mitigate impacts on fish and wildlife before resources have been committed to a particular development plan.

The record also discloses that the environmental review process for a CEQA project or a timber harvest plan can involve various biologists at the regional level, consultation with biologists at headquarters and review of various data bases. Moreover, the biologists often work on several projects simultaneously and perform work which benefits all the projects. Consequently, the evidence suggests it would be cumbersome and expensive to account for multiple biologists' time, from multiple regions, working multiple projects.

The evidentiary thrust to Fish and Game's argument is that the cost of performing its duties under CEQA and the Forest Practice Act far exceeds the revenue generated under section 711.4. (*City of Dublin v. County of Alameda, supra,* 14 Cal.App.4th at p. 282.) Under the accounting system dismantled in 1991, Fish and Game employees recorded their time and charged the time to various codes. Before changing to a new system, the

employees' time sheets were surveyed and analyzed. A new coding system was predicated on these surveys and analyses. Mills complains that the new system camouflages and inflates the true costs of environmental review.

The trial court found Fish and Game met its burden of proving the cost of its environmental review programs. The court wrote, "While Plaintiff attacks the Department's method of converting its costs under its old accounting system to the new accounting program, the authorities do not require absolute precision. Rather, as long as the estimate of costs is a reasonable one, it will be upheld."

We need not perform an appellate audit of Fish and Game's accounting systems. Having reviewed the entire record, we are satisfied there is sufficient evidence to support the trial court's finding that the cost of comprehensive environmental review far surpasses the amount of fees generated under section 711.4. " '[W]e would be demanding the impossible by insisting on rigorously supported findings.' [Citation.] All that our review requires is that we are able to determine that the [Legislature] acted after finding a reasonable relationship between the fee and the need to which the development contributes." (*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 247 [1 Cal.Rptr.2d 818].) Mills squabbles about the costs associated with the review of Fish and Game's own projects, the preparation of resource databases, and a few other relatively small items. His argument, like his expert's testimony, proves the point. Complex regulatory programs involve complex accounting methodologies which render a more conventional "user fee" assessment impractical or expensive.

There is also evidence that the administrative costs to implement an extensive and comprehensive time-reporting system would be high. The evidence shows that biologists often simultaneously perform the preliminary work establishing resource data for several projects and consult and research issues relating to many different projects. It is reasonable to assess a flat fee and thereby reduce the cost and administrative difficulty of accounting for the services provided for each individual project. Moreover, collection of a flat fee at a uniform time eases the administrative burden of collection and provides certainty to those who submit project proposals.

Fish and Game provides an apt analogy to demonstrate the reasonableness of flat fees. The Legislature has adopted a flat filing fee for filing an action in superior court whether the matter is a simple case requiring little time and attention or a complex case requiring intensive judicial resources from pretrial motions through a lengthy trial. By statute, statewide judicial fees

cannot be increased or decreased by counties to provide any kind of graduated structure. (Gov. Code, § 54985, subd. (c)(1).) The fees imposed by section 711.4 are quite similar. Like a civil action, the environmental review may be time and staff intensive or it may be summarily handled. In neither case does the fee operate as a tax just because a prescribed amount is charged to all who avail themselves of the opportunity to obtain discretionary government services.

■ Finally, plaintiff also challenges the Legislature's decision to charge a higher fee for the filing of a negative declaration than for other environmental documents. As explained by a Fish and Game senior environmental specialist supervisor at trial, the standard for a negative declaration is that a project have no adverse impact on the environment. Thus, Fish and Game has the responsibility to make sure the disclosure of the possible impacts is complete and to assure any mitigation measures are adequate. Often, the proposed mitigation measures are inadequate, and Fish and Game staff must work with the lead agency and with the project proponent to develop an acceptable negative declaration document. The supervisor testified that his staff probably spends more time on the review of a negative declaration than for the review of an equivalent size project with EIR (environmental impact report) documentation. Hence, because of project information collection cost and the time spent negotiating mitigation measures, Fish and Game's costs are generally higher for negative declarations. There is a sufficient reasonable basis for the legislative decision to charge more for the review of a negative declaration than for the review of an environmental impact report.

## V

We need not address the many other issues raised by the parties in these consolidated cases rendered moot by our finding that section 711.4 does constitute a regulatory fee. Moreover, we dismiss Mills's second appeal because it too is rendered moot by our finding. In the underlying case, the California Association of Professional Scientists sought to enjoin the settlement entered into by Mills and Fish and Game in the original action. The crux of the appeal is whether the trial court properly restricted its constitutional ruling to Mills alone. Since we have upheld the constitutionality of section 711.4, we need not decide whether the trial court erred by invoking article III, section 3.5 of the California Constitution to limit the scope of its constitutional ruling.

Many of the arguments raised by Mills, and echoed by his expert at trial, are rooted in the perception that a flat fee is unfair. They object vociferously

to the disparity between the amount of the fee and the services provided for different projects. This may be so. The scope of our inquiry, however, is not whether the fee is fair but whether the fee is, in legal effect, a tax. This case is not a challenge to the legislative power to enact a fee, nor is it a substantive constitutional challenge to the fee. We were asked to make the legal determination as to whether it is a fee exclusively for the purpose of determining whether it was properly enacted by a majority vote. Constrained by the limited scope of appellate review, we have concluded the Legislature did not violate California Constitution, article XIII A by enacting the section 711.4 fees by a simple majority vote. Any further challenge to the equity of a flat fee structure must be presented to the Legislature for the issue is political, not constitutional.

## DISPOSITION

The appeal in case No. C023075 is dismissed. The judgment in case No. C023184 is affirmed in part and reversed in part as explained above. In both cases, Mills shall pay the costs on appeal.

Sims, Acting P. J., and Nicholson, J., concurred.

The petition of appellant Albert W. Mills for review by the Supreme Court was denied July 12, 2000.