[No. D042529. Fourth Dist., Div. One. July 21, 2004.]

RINCON DEL DIABLO MUNICIPAL WATER DISTRICT et al., Plaintiffs and Appellants, v.
SAN DIEGO COUNTY WATER AUTHORITY et al., Defendants and Respondents.

814

**COUNSEL**

Glenn, Wright, Jacobs & Schell, Kent H. Foster and Donald R. Worley for Plaintiffs and Appellants.

Fox & Sohagi, Margaret Moore Sohagi, Philip A. Seymour; and Daniel S. Hentschke for Defendants and Respondents.

**OPINION**

**O'ROURKE, J.**—Rincon Del Diablo Municipal Water District, Vallecitos Water District, Valley Center Municipal Water District, Vista Irrigation District and Yuima Municipal Water District (collectively the Northern Districts) sued the San Diego County Water Authority (SDCWA) and all other interested persons to invalidate the portion of SDCWA's Ordinance No. 2002-03 (the Ordinance) setting the transportation rate, a component of the water rate. After the parties each filed summary judgment motions, the court granted summary judgment in favor of SDCWA. The Northern Districts appeal, contending: (1) the capital portion of the transportation rate (capital portion) is a capacity charge as defined by Government Code section 66013[1];

---

[1] All further statutory references are to the Government Code unless otherwise specified.

and (2) the capital portion violates section 66013 because it is not reasonable. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

SDCWA is an independent public agency operating under the authority of the County Water Authority Act. (Wat. Code, App., ch. 45.) It provides wholesale water service to 23 member agencies, including the Northern Districts. SDCWA purchases all the water it provides from the Metropolitan Water District of Southern California (MWD). That water enters SDCWA's aqueduct system at turnover points located near the border of San Diego and Riverside Counties.

The Northern Districts comprise five of the water districts in the northeastern section of San Diego County, which are near the turnover points. Because MWD water enters at the northern boundary of San Diego County, the Northern Districts use less of SDCWA's aqueduct system than those water districts in the southern part of San Diego County. In 1998, the agencies comprising the Northern Districts plus Fallbrook Public Utility System and Rainbow Municipal Water District formed the Economic Study Group (ESG) and hired Bookman-Edmonston Engineering to conduct a study of SDCWA's water rates and propose modifications "to fairly reflect the cost of service . . . to ESG members." The ESG Study allocated pipeline capital costs and system maintenance based upon the length of the pipeline needed to provide water to the various agencies. Under that analysis, the Northern Districts would pay 4.2 percent of total pipeline capital costs instead of the 14 percent they had been paying.

Historically, SDCWA charged a flat dollar rate for each acre-foot of water. Such a flat fee is also known as a "postage stamp" water rate. In November 1998, SDCWA retained A&N Technical Services to analyze and evaluate various water rate structures and recommend a revised rate structure. Based on that analysis, SDCWA staff prepared a rate study in 2000 that unbundled water rates into four categories, one of which is the transportation rate. The transportation rate captures the capital costs as well as the operating and maintenance costs of SDCWA's aqueduct system, excluding the costs to operate the system as a whole or significant portions of the system. The capital costs recovered by the transportation rate comprise about 75 percent of the total revenue recovered. The operations and maintenance portion of the transportation rate recovers about 74 percent of the costs of SDCWA's operations and maintenance department, 70 percent of its engineering department, 75 percent of its right-of-way department, as well as other costs.

The SDCWA rate study analyzed the following cost allocations for the transportation rate: (a) point-to-point, which is based upon distance from

MWD delivery point and peak capacity; (b) zones of cost, which separates the system into four geographic zones from north to south; (c) shareholder, which captures the historic financial contributions of each agency based upon its voting shares; and (d) postage stamp, which is a uniform charge per acre-foot of water. The study also computed relative percentages of costs to each water agency under each method and under the ESG proposal.

In April 2002, the SDCWA (the Board) Board adopted the proposed rate structure recommended by a subcommittee it had established to review the SDCWA rate study. The Board submitted the rate structure it adopted to a peer review, which concluded that the rate structure is "consistent with cost of service principles . . . and reasonably allocates [SDCWA's] cost of service to each of its member agencies." The review further states: "Under typical cost of service allocations, transmission and distribution related costs are allocated to customers based upon peaking. This is due to the fact that these facilities are designed to handle customer peak demands. However, in SDCWA's case, all member agencies are treated as a single class, as a result this allocation is less relevant and their use of a uniform rate is appropriate. [¶] Two other allocation methods for this service category that are discussed in the rate report and are commonly considered to have cost of service qualities are the point-to-point allocation and zones of cost allocation. These alternatives are considered particularly when system costs may vary by zone or distance. Although these allocation approaches are sometimes considered, in our experience, they are not typical due to the fact that systems are often integrated and it is difficult to identify discrete costs."

On June 27, 2002, the Board adopted the Ordinance that incorporated the new water rate. The water rate consists of a customer service charge, an emergency storage program charge, the transportation rate, a supply charge that includes a capacity reservation charge and a readiness-to-serve charge, and an infrastructure access charge. The Ordinance did not affect the standby availability charge or the capacity charge.[2] The Ordinance sets the transportation rate at $55 for each acre-foot of water. Revenue from the transportation rate and the other components of water sales are placed in SDCWA's general fund and are not segregated to fund capital costs. The transportation rate is also the charge for "wheeling," which is "[t]he use of a water conveyance facility by someone other than the owner or operator to transport water . . . ." (*Metropolitan Water District v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1407 [96 Cal.Rptr.2d 314] (*MWD*).)

On October 17, 2002, the Northern Districts filed their complaint to invalidate the Ordinance under Government Code section 66022 and

---

[2] SDCWA's capacity charge is a one-time charge to new water customers based on the size of the water meter they require.

Code of Civil Procedure sections 860 et seq., alleging the Ordinance violates Government Code section 66013. The parties filed cross-motions for summary judgment. The court denied the motion brought by the Northern Districts and granted SDCWA's motion. The court ruled the transportation rate is not a capacity charge under Government Code section 66013 because it "is not a charge for 'facilities' within the meaning of the statute but rather a charge for the delivery of water." The court further ruled that "[e]ven if the Transportation Rate were a capacity charge, it does not exceed the estimated reasonable cost of providing the service."

## DISCUSSION

### I. *Section 66013*

■ Section 66013, subdivision (a) provides, "fees for water connections or sewer connections, or . . . capacity charges . . . shall not exceed the estimated reasonable cost of providing the service for which the fee or charge is imposed . . . ." Subdivision (b)(3) defines a capacity charge as "a charge for facilities in existence at the time a charge is imposed or charges for new facilities to be constructed in the future that are of benefit to the person or property being charged."

The facts are undisputed in the instant case. "Where the material facts are conceded or undisputed, as in this case, the issue becomes one of statutory interpretation and therefore is purely a question of law" that we review de novo. (*San Diego County Water Authority v. Metropolitan Water District of Southern California* (2004) 117 Cal.App.4th 13, 22 [11 Cal.Rptr.3d 446] (*MWD*).)

"When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent." (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148, 863 P.2d 218].) "But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . . Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) " ' "Statutes should be construed so as to be given a reasonable result consistent with the legislative purpose." [Citations.] . . . "The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' "

*(Carlton Santee Corp. v. Padre Dam Mun. Water Dist.* (1981) 120 Cal.App.3d 14, 25 [174 Cal.Rptr. 413] *(Carlton Santee Corp).*)

## II. *Capacity Charges*

The Northern Districts contend the capital portion, which is approximately 75 percent of the transportation rate, is a capacity charge under the plain meaning of section 66013, subdivision (b)(3) because the aqueduct system and its pipelines are facilities that benefit the member agencies in that they are needed to deliver water to the member agencies. Under that interpretation, the Northern Districts contend the capital portion is a special assessment and not a user fee.

■ Under California case law, water rates are considered user or commodity charges because they are based on the actual consumption of water. *(Howard Jarvis Taxpayers Assn. v. City of Los Angeles* (2000) 85 Cal.App.4th 79, 83 [101 Cal.Rptr.2d 905] [ruling that water rates are not governed by Prop. 218]; *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 595–597 [77 Cal.Rptr.2d 752] *(Isaac).*) User rates are functionally distinct from special assessments, which are compulsory charges levied against certain properties for public improvements that directly or indirectly benefit the property owner and are not related to the use of the public improvement. *(Isaac,* at pp. 595–597; *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 161–162 [228 Cal.Rptr. 47, 720 P.2d 935] *(San Marcos).*) Further, the power to set water rates comes from the public agency's "proprietary and quasi-public capacity" *(County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 161 [161 Cal.Rptr. 172, 604 P.2d 566]), while the power to impose special assessments or other capital charges derives from the taxing power. *(Inglewood v. County of Los Angeles* (1929) 207 Cal. 697, 703–704 [280 P. 360].) "[T]he utility customer's agreement to pay a certain rate for a certain usage of utilities is a contractual obligation, and is far removed from the revenue raising devices of assessments and taxes." *(Isaac, supra,* at p. 597.) On the other hand, water rates are not distinguished from taxes by their use to fund capital improvements. Historically, water rates are usually used to recover all costs incurred in providing water, including the costs of building, maintaining and improving the water system. *(Hansen v. City of Buenaventura* (1986) 42 Cal.3d 1172, 1181 & fn. 9 [233 Cal.Rptr. 22, 729 P.2d 186].) Further, county water authorities are required to set rates to pay for bonded indebtedness. (71 West's Ann. Water Code, Appen., § 45-7, subd. (j).) For these reasons, the transportation rate, which is part of SDCWA's water rate, is not a capacity charge.

■ We do not presume the Legislature " ' "intends to overthrow long-established principles of law unless such intention is made clearly to appear

either by express declaration or by necessary implication." ' " (*Fuentes v. Workers' Compensation Appeals Board* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) Nothing in the language of section 66013 nor in its legislative history expresses an intention to impose a new standard on water rates. Section 66013, formerly codified as section 54991,[3] was enacted by Senate Bill No. 1454. The Senate Local Government Committee explained the impetus for the bill: "In 1981, the Legislature limited several types of local planning and development fees to the 'estimated reasonable cost of providing the service for which the fee is charged.' Charges above that level are treated as special taxes, subject to 2/3 voter approval [citation]. . . . [¶] When they approve development projects, local officials often require developers to install public facilities, dedicate land, or pay in lieu fees. These requirements are commonly called 'exactions' and are authorized by several statutes and local governments' inherent powers. Some developers believe that some local exactions are excessive; neither fair nor reasonable. They want to create a statutory test." (Sen. Local Government Com., Rep. on Sen. Bill No. 1454 (1985–1986 Reg. Sess.) Jan. 9, 1985.)

As introduced, Senate Bill No. 1454 required a broad definition of local government fees[4] and exactions to "not exceed the estimated reasonable cost of providing the service or facility for which the fee is charged . . . ." The bill's first amendment specifically excluded from that broad definition "taxes, special assessments, or charges by a utility for water, sewer, gas, or electric services" and clarified that it did include "charges for water or sewer connections or *capacity charges*." (Italics added.) The bill's second amendment, dated April 29, 1985, narrowed the bill's scope still further to development fees, other specifically defined fees, and capacity charges, which it defined. The language of the portion of the April 29, 1985 amendment that became section 66013 was not changed by the bill's subsequent amendments. The Assembly described Senate Bill No. 1454 as "[a]llow[ing] local agencies which provide water and sewer services to levy various fees including standby or availability fees, benefit assessments, and user fees." (Assem. 3d reading analysis of Sen. Bill No. 1454 (1985–1986 Reg. Sess.) Aug. 26, 1986.) This legislative history does not show the Legislature intended to impose a new standard on water rates.

---

[3] In 1990, former section 54991 was recodified as section 66013. Although former section 66013 has been amended by adding additional sections, those amendments did not change the relevant sections of former section 54991.

[4] The bill defined "fees" as "any monetary imposition or dedication or reservation of land imposed by a local agency from which the local agency derives revenues in excess of one hundred dollars ($100) per year."

The Northern Districts base their contention the capital portion is a special assessment upon *San Marcos, supra,* 42 Cal.3d 154.[5] In *San Marcos,* the Supreme Court held that "a one-time fee for capital improvements paid at the time of connection [and] based on anticipated sewage discharge" (*San Marcos,* at p. 159, italics omitted) is a special assessment from which public entities are exempt under article XIII section 3, subdivision (b) of the California Constitution unless "the Legislature authorizes [the] payment." (*San Marcos,* at p. 165, italics omitted.) The court held that although the fee, which was called a capacity fee, was a hybrid between a special assessment and a user charge, it would follow previous appellate court cases and "look[] to the *purpose* of the fee being charged, and not simply to the *form* of the fee . . . ." (*Id.* at p. 163.) However, the Supreme Court rejected the argument that *San Marcos* established a broad rule applicable to cases not brought under article XIII, section 3 of the California Constitution: "In deciding what constituted an assessment in *San Marcos,* we sought to determine and effectuate the constitutional purpose for exempting public entities from property taxes, a purpose that plays no role in interpreting the provisions . . . that are at issue here." (*Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 422 [9 Cal.Rptr.3d 121, 83 P.3d 518] [analyzing art. XIII D of the Cal. Const.].) Further, *San Marcos* was decided on July 21, 1986, *after* the Legislature defined "capacity charge" in the April 25, 1985 amendment. For these reasons, we do not find *San Marcos* useful in "this strikingly different context." (*Richmond v. Shasta Community Services Dist., supra,* 32 Cal.4th at p. 422.)

■ Further, the Northern Districts' application of the "purpose test" of *San Marcos* ignores the traditional distinctions between different types of governmental revenue. Under the Northern Districts' interpretation, the sole criteria for determining whether a fee is a capacity charge is whether some portion of the revenue from that fee is expended on capital facility costs. Because most public agencies spend some portion of their funds to pay facility costs, at least a portion of every fee, charge, special assessment and many other taxes imposed by most agencies would be a capacity charge, including parking fees, recreational fees, and rental fees. It is not reasonable to assume the Legislature intended its definition of capacity charge to abolish the distinctions among the various types of governmental revenue sources, each of which is governed by its own statutory scheme.

■ In reaching our conclusion, we reject the Northern Districts' contention the capital portion must be a capacity charge in order to adhere to the spirit of Proposition 13. In *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178 [29 Cal.Rptr.2d 128], the court explained that block water

---

[5] The legislative history makes clear the Legislature was aware of *San Marcos* prior to the passage of Senate Bill No. 1454.

rates, which charge a higher amount per unit for water usage over a certain threshold, do not fall under Proposition 13: "The inclining block rate structure bears none of the indicia of taxation which California Constitution, article XIII A purported to address. The rate structure was not designed to replace property tax monies lost in consequence of the enactment of California Constitution, article XIII A. The rates were levied against water consumers in accordance with patterns of usage, and at no cost to taxpayers generally. The incremental rate was not compulsory to the extent that any consumer had the option of reducing his or her consumption. [¶] At the time of the enactment of California Constitution, article XIII A, the structure, procedure and standards for utility rate assessment were firmly established. . . . [¶] . . . [¶] Significantly, there is nothing in the legislative history of California Constitution, article XIII A which would remotely suggest an intention to accomplish a wholesale revision of the Public Utilities Code as to ratemaking procedure." (*Brydon v. East Bay Mun. Utility Dist.*, supra, 24 Cal.App.4th at p. 194.) Although the transportation rate is a postage stamp rate rather than a block rate, we find the analysis in *Brydon* compelling. The transportation rate was not designed to replace property tax revenue lost due to Proposition 13 nor is there any indication the Legislature intended to revise the statutory scheme governing water rates. For these reasons, neither the transportation rate nor the capital portion of that rate is a capacity charge under section 66013.

### III. *Reasonableness*

█ Even if the transportation rate were held to be a capacity charge, it does not violate section 66013. Subdivision (a) of section 66013 provides in part: "[W]hen a local agency . . . imposes capacity charges, those fees or charges shall not exceed *the estimated reasonable cost of providing the service for which the fee or charge is imposed* . . . ."[6] (Italics added.) Under the language of the statute, a capacity charge does not violate section 66013 unless it exceeds the cost of providing the service. The Northern Districts do not contend the total revenue collected through the transportation rate exceeds the capital, maintenance and operating costs of SDCWA's aqueduct, nor do they contend the capital portion exceeds the capital costs of the aqueduct. Therefore, the transportation rate and the capacity portion do not violate section 66013.

---

[6] Subdivision (a) of section 66013 provides: "Notwithstanding any other provision of law, when a local agency imposes fees for water connections or sewer connections, or *imposes capacity charges*, those fees or charges shall not exceed *the estimated reasonable cost of providing the service for which the fee or charge is imposed*, unless a question regarding the amount of the fee or charge imposed in excess of the estimated reasonable cost of providing the services or materials is submitted to, and approved by, a popular vote of two-thirds of those electors voting on the issue." (Italics added.)

The Northern Districts contend section 66013 requires they be charged only the costs attributable to their specific burden on the system. They argue we must read subdivisions (a) and (b)(3) of section 66013 together as follows: "[F]acilities in existence at the time a charge is imposed or charges for new facilities to be constructed in the future" (§ 66013, subd. (b)(3)) "shall not exceed the estimated reasonable cost" (§ 66013, subd. (a)) "to the person or property being charged" (§ 66013, subd. (b)(3)) "of providing the service for which the fee or charge is imposed" (§ 66013, subd. (a)). We do not believe the Legislature intended we understand section 66013 through such a contorted juxtaposition of subdivisions (a) and (b)(3). Further, when the Legislature intends a fee to be based upon a particular user's burden on the facility, it has stated that intention clearly, even within the Fee Mitigation Act of which section 66013 is a part. For example, section 66001 provides that a local agency imposing a development fee "shall determine how there is a reasonable relationship between the *amount of the fee* and the *cost* of the public facility or portion of the facility *attributable to the development* on which the fee is imposed." (§ 66001, subd. (b), italics added.)

The Northern Districts also contend the legislative history of Senate Bill No. 1454 supports their interpretation. The bill as introduced limited charges: "The reasonable cost of providing a service or facility, including any equipment, shall be determined by the local agency allocating a share of the costs of the service or facility among all potential users of the service or facility based upon *a reasonable estimate of the burden on the public service or public facility directly attributable to the individual or parcel of property being charged.*" (Italics added.) However, the April 29, 1985 amendment that added capacity charges also added the same limitation as now contained in section 66013, subdivision (a): "the estimated reasonable cost of providing the service for which the fee or charge is imposed." That amendment and future amendments limited the language upon which the Northern Districts rely *only* to development fees.

▪ The Northern Districts also rely on cases applying the following test: to show a fee is a regulatory fee and not a special tax, the government should prove "(1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's *burdens on or benefits from* the regulatory activity." (*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 945 [94 Cal.Rptr.2d 535] (*Fish & Game*), italics added; *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 878 [64 Cal.Rptr.2d 447, 937 P.2d 1350]; *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1146 [250 Cal.Rptr.

420].) In this case, the transportation rate satisfies that test by apportioning costs based upon the *benefits received*—the amount of acre-feet of water delivered.

Further, numerous cases have upheld flat fees in various contexts. Prior to the passage of section 60013, we upheld a uniform sewer connection fee for each residential household. (*Carlton Santee Corp., supra,* 120 Cal.App.3d 14.) Stating that a "site-specific review" is not required, courts have also upheld flat-rate development fees (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320 [4 Cal.Rptr.2d 897] [flat fee per square foot]; see also *Canyon North Co. v. Conejo Valley Unified School Dist.* (1993) 19 Cal.App.4th 243 [23 Cal.Rptr.2d 495] [same]) and flat regulatory fees (*Fish & Game, supra,* 79 Cal.App.4th 935 [filing fees for review of CEQA documents]). Moreover, a flat-rate water wheeling fee was upheld over SDCWA's argument that the fee should have been based on the distance the water traveled through the aqueduct. (*MWD, supra,* 80 Cal.App.4th at pp. 1431–1432.) For these reasons, the trial court correctly held the transportation rate was reasonable under section 66013.

## DISPOSITION

The judgment is affirmed. Appellants are to pay costs on appeal.

Benke, Acting P. J., and Irion, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 17, 2004. Brown, J., did not participate therein.