[No. A105674. First Dist., Div. Five. July 6, 2005.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Plaintiff and Appellant, v.
EAST BAY MUNICIPAL UTILITY DISTRICT, Defendant and Appellant.

1364

COUNSEL

James E. Holst, Stephen P. Morrell; Thelen Reid & Priest and Anthony J. Barron for Plaintiff and Appellant.

Robert C. Helwick, Craig S. Spencer, Joel Fried; Fox & Sohagi, Margaret Moore Sohagi and Philip A. Seymour for Defendant and Appellant.

Lagerlof, Senecal, Bradley, Gosney & Kruse, Thomas S. Bunn III; Woodruff, Spradlin & Smart and Thomas L. Woodruff for Association of California Water Agencies, California State Association of Counties, California Association of Sanitation Agencies and League of California Cities as Amici Curiae on behalf of Defendant and Appellant.

OPINION

**GEMELLO, J.**—In *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154 [228 Cal.Rptr. 47, 720 P.2d 935] (*San Marcos*), the Supreme Court held that the constitutional public entity exemption from special assessments prohibited a local water district from imposing a capacity fee used to fund capital improvements to the water system, absent legislative authorization. The Legislature responded to the *San Marcos* decision by enacting Government Code section 54999 et seq.,[1] often referred to as the San Marcos Legislation, authorizing public utilities to impose "capital facilities fees" on public entities, subject to certain limitations. This case involves the application of the San Marcos Legislation to the capital component of a public utility's periodic water service charges imposed on a public university.

The Regents of the University of California and the East Bay Municipal Utility District each appeal from a judgment on the Regents' refund action, challenging the fiscal year 2002 water rates. The Regents contend that the district's rates contain capital facilities fees exceeding the limitations imposed by the San Marcos Legislation. The district contends that the charges are not capital facilities fees within the scope of the statute and that, in any

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

event, the statute does not authorize refunds. We hold that the trial court properly concluded that the district's water rates contain capital facilities fees and that the statute authorizes refunds, but that the trial court incorrectly applied the "Implicit Price Deflator" fee limitation in the San Marcos Legislation. We affirm in part and reverse in part.

### FACTUAL AND PROCEDURAL BACKGROUND

The material facts are undisputed. The dispute lies in the application of the law to those facts. This case relates to defendant East Bay Municipal Utility District's (East Bay MUD or District) fiscal year 2002 (FY 2002) periodic charges for water and wastewater service, as imposed on the Regents of the University of California (Regents). The Regents paid a total of $2,966,972.16 in periodic water and wastewater charges in FY 2002.

The Regents filed a complaint in January 2002, alleging that the rates established by the District for its various water and wastewater charges exceeded the rates which may be charged under section 54999.3, part of the San Marcos Legislation.[2] In particular, the Regents alleged that the District's FY 2002 rates include capital facilities fees which exceed the section 54999.3 limitations because they charge the Regents for facilities which do not actually serve them (the Actually Serving Limitation) and because the fees exceed the percentage increase in the Implicit Price Deflator for State and Local Government Purchases (the Price Deflator Limitation). (See § 54999.3.)[3]

In its answer and subsequent filings, East Bay MUD acknowledged that its rates provide revenue for payment of capital expenses, but disputed that any portion of its rates is a capital facilities fee. The District's rates are calculated to balance total revenues with the actual cost of providing water service to the District's users. This actual cost includes the costs of capital facilities, although the revenue generated from the portion of the rates calculated to cover the capital costs is not segregated from the revenue generated from the portion of the rates calculated to cover operating and maintenance expenses. In FY 2002, the costs of capital facilities represented approximately 40 percent of the total costs recovered through water rates.

The trial court filed a stipulated case management order establishing a two-phase trial. The phase I trial was to decide whether East Bay MUD's

---

[2] The January 2002 suit was not the Regents' first against the District for refund of alleged overcharges based on the San Marcos Legislation. The Regents also sued in 1997; that case settled in 1999 with East Bay MUD refunding past claimed overcharges and reducing the fiscal year 2000 and fiscal year 2001 capital charges.

[3] The Regents stipulated below that there was no overcharge for wastewater service in FY 2002; it is the water service charges that are actually at issue in this case.

periodic charges are subject to section 54999; if so, whether the District complied with the limitations in section 54999.3; and whether the District's affirmative defenses bar the Regents' claims. The parties submitted a joint statement of stipulated facts. The trial court rejected the District's affirmative defenses and concluded that each of the challenged periodic rates at issue contain capital facilities fees; that the Regents paid for facilities that did not "actually serve" them; and that, for the purpose of the Price Deflator Limitation, the FY 2002 capital facilities fees should be determined by reference to the fees charged in fiscal year 1999.

Phase II was to decide all remaining issues. The parties submitted a phase II joint statement of stipulated facts, specifying the amount of overcharges under different interpretations of the limitations in the San Marcos Legislation. The trial court's phase I and II decisions were incorporated into a final judgment awarding the Regents a $47,000 refund based on the Price Deflator Limitation as calculated using fiscal year 1999 as the baseline and declaring that there was no overcharge under the Actually Serving Limitation. The judgment invalidated the District's resolution enacting the challenged rates "to the extent it resulted in overcharges to the Regents in the amount of $47,000.00 based upon [the District's] violation of the Implicit Price Deflator limitation as to The Regents."

The Regents appealed, contending that the trial court erred in its construction of the Price Deflator and Actually Serving Limitations. East Bay MUD cross-appealed, contending that the trial court erred in concluding that the District's rates contain capital facilities fees within the meaning of the San Marcos Legislation and in concluding that the statute authorizes refunds of overcharges.

DISCUSSION

I. *The Supreme Court Decision in* San Marcos *and the San Marcos Legislation*

 A. *The* San Marcos *Decision*

■ In *San Marcos, supra,* 42 Cal.3d 154, the Supreme Court considered whether a school district was exempt from a local water district's capacity fee, used to fund capital improvements to the water system. At issue was article XIII, section 3, subdivision (b) of the California Constitution, exempting property owned by public entities from property taxation. From that constitutional exemption, California courts have implied a further exemption of such property from special assessments, absent legislative authorization. (*San Marcos*, at pp. 160–161, citing *Inglewood v. County*

*of Los Angeles* (1929) 207 Cal. 697, 703–704 [280 P. 360].) "The rationale behind a public entity's exemption from property taxes and special assessments is to prevent one tax-supported entity from siphoning tax money from another such entity; the end result of such a process could be unnecessary administrative costs and no actual gain in tax revenues. [Citation.]" (*San Marcos*, at p. 161; see also *Smith v. City of Santa Monica* (1912) 162 Cal. 221, 222 [121 P. 920] ["to countenance taxation of [public] property would be to countenance the folly of the sovereign taxing its own property 'and taking money out of one pocket to put in another' "].)

The Supreme Court considered whether the capacity fee at issue, a one-time fee for capital improvements paid at the time of connection and based on anticipated sewage discharge, was more properly characterized as a special assessment or as a user fee for purposes of the property tax exemption. (*San Marcos*, *supra*, 42 Cal.3d at p. 159.) A special assessment is " 'a compulsory charge placed by the state upon real property within a predetermined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein.' " (*Id.*, at p. 161.) "In contrast to a special assessment, a usage fee typically is charged only to those who use the goods or services. The amount of the charge is related to the actual goods or services provided to the payer. The usage fee for an ongoing service would normally be a monthly charge rather than a one-time charge." (*Id.* at p. 162.) The court characterized the capacity charge at issue as a "hybrid" because it had " 'some characteristics which resemble a special assessment (one time charge; not based on actual use) and some which look more like a user charge (charge only applies to users; based on anticipated use).' " (*Id.* at p. 163, quoting Court of Appeal decision.)

The *San Marcos* court held, "Under the rule we adopt, no matter how the *form* of the fee is varied (i.e., whether based on actual or anticipated use, or unrelated to use; whether a one-time fee or monthly fee; and whether charged to all property owners or only to users of the sewer system), the *purpose* of the fee will determine whether or not public entities are exempt from paying the fee. In sum, a fee aimed at assisting a utility district to defray costs of capital improvements will be deemed a special assessment from which other public entities are exempt." (*San Marcos*, *supra*, 42 Cal.3d at pp. 164–165.)

The Supreme Court recently reaffirmed the *San Marcos* decision, which it characterized as holding "that the fee should be considered an assessment for purposes of the public entity property tax exemption," and establishing "a bright-line rule that 'a fee aimed at assisting a utility district to defray costs of capital improvements will be deemed a special assessment from which other public entities are exempt.' " (*Richmond v. Shasta Community*

*Services Dist.* (2004) 32 Cal.4th 409, 422 [9 Cal.Rptr.3d 121, 83 P.3d 518] (*Richmond*), quoting *San Marcos, supra,* 42 Cal.3d at pp. 164–165.) In adopting this rule the *San Marcos* court relied upon three previous Court of Appeal decisions which "established a rule which looks to the *purpose* of the fee being charged, and not simply to the *form* of the fee, a matter which can be easily manipulated." (*San Marcos*, at p. 163.)

The Court of Appeal decisions discussed by *San Marcos* each held that different types of utilities fees charged to public entities fell within the scope of the special assessment exemption. In *County of Riverside v. Idyllwild County Water Dist.* (1978) 84 Cal.App.3d 655 [148 Cal.Rptr. 650], a water district attempted to collect a capital cost sewer capacity charge from tax-exempt entities. The court held that "[t]he charges are in effect a special assessment under a different name and constitute an attempt by the district to do indirectly that which it could not do directly." (*Id.* at p. 660.)

In *Regents of University of California v. City of Los Angeles* (1979) 100 Cal.App.3d 547 [160 Cal.Rptr. 925] (*Regents I*), the court held that a "sewage facilities charge" could not be imposed on public entities. "[A]lthough the amount of the 'sewage facilities charge' is based upon anticipated use of the sewer system by the user, the collected revenues are not used to defray the costs of providing sewer service to the users. . . . Rather, the revenues collected as a result of the 'sewage facilities charge' are used by the city to provide capital for sewer construction, i.e. to finance local improvements. Such a charge for capital funding is little more than a disguised special assessment." (*Id.* at pp. 549–550.)

Finally, *Regents of the University of California v. City of Los Angeles* (1983) 148 Cal.App.3d 451 [196 Cal.Rptr. 14] (*Regents II*) arose after the City of Los Angeles increased its periodic sewer service charge in response to the disapproval of its "sewage facilities charge" in *Regents I*. The new service charge included two components: (1) "For the payment of costs of operation and maintenance (including replacement) for the sewer system"; and (2) "For the financing of capital improvements to sewer system." (*Regents II*, at p. 453.) The court rejected the city's argument that the new charge differed from the one in *Regents I* because it was based on actual use. The court held that the test is "the *purpose* of the disputed charge." (*Regents II,* at p. 455.) The court distinguished those situations which "deal with a true sewer service charge, i.e., a fee for the use of sewage facilities, not for capital construction of those facilities." (*Ibid.*)

### B. *The San Marcos Legislation*

In direct response to the *San Marcos* decision, the Legislature granted public utilities authority to impose capital facilities fees on other public

entities, thereby removing the public entity exemption as to those fees. (See §§ 54999–54999.6 (the San Marcos Legislation); *Richmond, supra*, 32 Cal.4th at p. 422, fn. 4; *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1189 [114 Cal.Rptr.2d 459, 36 P.3d 2] (*Indian Wells*); *Utility Cost Management v. East Bay Mun. Utility Dist.* (2000) 79 Cal.App.4th 1242, 1246–1247 [94 Cal.Rptr.2d 777].)

Section 54999 provides: "(a) The Legislature finds and declares that many public entities that provide public utility service have imposed capital facilities fees applicable to users of public utility facilities in order to equitably apportion the cost of capital facilities construction or expansion required by all public and private users of the facilities. In the recent decision in San Marcos Water Dist. v. San Marcos Unified School Dist., 42 Cal.3d 154, the California Supreme Court held that public entities cannot be made subject to these fees without statutory authorization. As a result, the fiscal stability and service capabilities of the affected public utility service agencies which have in good faith collected and spent these fees for capital improvements are seriously impaired as is the ability to finance essential future facilities. [¶] (b) The Legislature further finds that the holding in the San Marcos Water Dist. v. San Marcos Unified School Dist., 42 Cal.3d 154, should be revised to authorize payment and collection of capital facilities fees subject to the limitations set forth in this chapter, and in furtherance of this finding the Legislature hereby enacts the following provisions."

Section 54999.1, subdivision (b) provides, " 'Capital facilities fee' or 'capacity charge' means any nondiscriminatory charge to pay the capital cost of a public utility facility." " 'Nondiscriminatory' means that the capital facilities fee does not exceed an amount determined on the basis of the same objective criteria and methodology applicable to comparable nonpublic users, and is not in excess of the proportionate share of the cost of the public utility facilities of benefit to the person or property being charged, based upon the proportionate share of use of those facilities." (§ 54999.1, subd. (f).) Section 54999.2 authorizes public utilities to impose capital facilities fees on public entities "except as provided in Section[] 54999.3." Section 54999.3 describes restrictions applicable when a public utility imposes the fees on either a state agency or an educational entity such as the University of California. In these circumstances, the fee must be "necessary to defray the actual construction costs of that portion of a public utility facility actually serving" the agency or educational entity. (§ 54999.3, subd. (a).) Moreover, the fee may not exceed the amount charged prior to the *San Marcos* decision (July 21, 1986), with increases "in an amount not to exceed the percentage increase in the Implicit Price Deflator for State and Local Government Purchases . . . ." (unless the parties agree to a higher fee). (§ 54999.3, subds. (a), (b).) In addition, upon request, or in the event of an increase in the fee, the public utility must "identify the amount of the capital facilities fee" and

"has the burden of producing evidence to establish [the propriety of] the . . . fee." (§ 54999.3, subd. (c); see also *Indian Wells, supra,* 26 Cal.4th at pp. 1189–1190.)

## II. *Is the Capital Component of East Bay MUD's Water Rates a Capital Facilities Fee?*

The Regents contend that the capital component of East Bay MUD's periodic charges is a capital facilities fee within the meaning of the San Marcos Legislation and that this portion of the charges is subject to the limitations described in section 54999.3. East Bay MUD does not dispute that its periodic seismic improvement surcharges and wet weather fees are capital facilities fees. These fees are used exclusively to fund new facilities and system improvements. East Bay MUD also does not dispute that a portion of its monthly or bimonthly water and wastewater service fees is used to pay capital expenses. However, it does dispute that these facts mean the capital component of its periodic water service rate constitutes a capital facilities fee within the meaning of the San Marcos Legislation. We conclude that the capital component of East Bay MUD's water rate is a capital facilities fee.

### A. *The Statutory Definition of "Capital Facilities Fee"*

Again, section 54999.1, subdivision (b) provides that " 'Capital facilities fee' or 'capacity charge' means any nondiscriminatory charge to pay the capital cost of a public utility facility." The Regents contend that "capital facilities fee," as defined, includes East Bay MUD's periodic charge for capital costs incorporated into the District's overall water rate. East Bay MUD contends that the phrase "charge to pay the capital cost of a public utility facility" includes only a "specific, identifiable fee or charge imposed for the specific purpose of paying capital facility costs."

█ Statutory construction is a question of law we decide de novo. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) Our primary objective in interpreting a statute is to determine and give effect to the underlying legislative intent. (Code Civ. Proc., § 1859.) " 'Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) " '[W]e seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . .' " (*Id.* at p. 634.) "If the words of a statute are reasonably free of ambiguity and uncertainty, we look no further than those

words to determine the meaning of that language." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1503 [82 Cal.Rptr.2d 368], citing *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 819 [226 Cal.Rptr. 81, 718 P.2d 68].) We can resolve the statutory interpretation issue here on the plain language alone.

The word "charge" is relatively inclusive. (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 920 [16 Cal.Rptr.2d 226, 844 P.2d 545].) The pertinent dictionary definition of the term is "the price demanded for something" (that is, the price demanded to pay the capital cost of a public utility facility). (Webster's 10th Collegiate Dict. (2001) p. 192, col. 1.) East Bay MUD contends that the word "charge" is ambiguous, and that the Legislature contemplated a narrower class of charges than asserted by the Regents. However, the statutory definition refers to "*any* nondiscriminatory charge." (§ 54999.1, subd. (b), italics added.) In *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] (*Delaney*), the Supreme Court held that the use of the word "any" in a voter-adopted constitutional provision relating to a newsperson's refusal to disclose "any unpublished information" meant that the statute unambiguously applied to all unpublished information, "without limit and no matter what kind." (See also *Indian Wells, supra,* 26 Cal.4th at p. 1191 [use of the word "any" serves to "broaden the applicability" of a provision].) To restrict the statute to confidential information, as was suggested in the case, would "read the word 'any' out of the section" and violate the interpretative guideline that significance should be given to every word of an act. (*Delaney, supra,* 50 Cal.3d at p. 798.) Following *Delaney,* we conclude that "charge" as used in the definition of "capital facilities fee" refers to all nondiscriminatory charges, and not only those listed separately and exclusively dedicated to the payment of capital costs. This includes the charge for capital improvements incorporated in East Bay MUD's periodic water rate.[4]

## B. *Judicial Interpretation of the* San Marcos *Decision*

Although we could rest upon the plain language of the statute alone, an examination of the background and purpose of the San Marcos Legislation confirms our conclusion that the charge at issue here is a capital facilities fee.

---

[4] Our interpretation finds support in language in section 54999.35, subdivision (b)(7), enacted in 2000 and applicable only to electrical utilities. That section refers to refunds for the "capital facilities fee component of a rate or charge," indicating that the Legislature understood "capital facilities fee" to apply to a charge incorporated into another rate or charge.

As noted previously, *San Marcos* established a bright-line rule that "a fee aimed at assisting a utility district to defray costs of capital improvements will be deemed a special assessment from which other public entities are exempt." (*San Marcos, supra,* 42 Cal.3d at pp. 164–165.) Both parties agree that the San Marcos Legislation was intended to address the types of fees and charges which would qualify as special assessments under *San Marcos.* As the Supreme Court explained in *Indian Wells, supra,* 26 Cal.4th at page 1189, "In response to our decision in *San Marcos* . . . the Legislature adopted the 'San Marcos Legislation,' providing the authorization for special assessments that we found lacking in that case." The Legislature's broad definition of capital facilities fee, which focuses exclusively on the purpose of the charge rather than its form, is parallel to the *San Marcos* test. It is reasonable and consistent with the Legislature's intent to interpret capital facilities fees as encompassing the types of charges that would be deemed special assessments under *San Marcos.*

To interpret "capital facilities fee" more narrowly makes little sense. If a charge for capital improvements incorporated into a user fee is a special assessment under the *San Marcos* purpose test but not a "capital facilities fee," then it is a charge that the Legislature failed to authorize and, therefore, it is prohibited under the constitutional provision exempting public entities from property tax. Nothing in the San Marcos Legislation reflects an intent to authorize only *some* of the types of charges that are special assessments under *San Marcos.* The Legislature's express intent was to authorize charges forbidden by *San Marcos.* As both parties recognize, the Supreme Court's decision in *San Marcos* is critical; East Bay MUD argues for a narrow interpretation of the purpose test and the Regents argue for a broad interpretation.

We conclude that the capital component of East Bay MUD's water rate constitutes a special assessment under the *San Marcos* purpose test. East Bay MUD acknowledges that its water rate contains a capital portion set at an amount sufficient to cover its projected system-wide capital expenses (at least those not covered by other assessments).[5] In FY 2002, the capital portion equaled 39.19 percent of East Bay MUD's water service rates. East Bay MUD's director of finance testified that the funds obtained from water rates pay for approximately 75 to 80 percent of the district's capital improvement program. Thus, it is undeniable that East Bay MUD has been charging the Regents a significant amount for capital costs, and that the capital portion of

---

[5] East Bay MUD states that "There is no dispute that revenue from EBMUD's service rates is used to pay a share of EBMUD's annual capital expenses. . . . During its annual budget process every year, every public utility projects its expected capital and operating expenses for the coming fiscal period, and adjusts its rates accordingly to ensure that revenues will meet the projected need." It frames the issue as "whether water rates that produce revenue to pay capital expenses may be deemed to constitute 'capacity charges' or 'capital facilities fees.' "

the water rate is critical to East Bay MUD's capital improvement efforts. Although the charge has the basic form of a user fee, under *San Marcos*, where the purpose of the charge is to pay capital expenses, the charge will be deemed an assessment for purpose of the public entity exemption. Furthermore, East Bay MUD's charge is almost indistinguishable from the charge for capital expenses incorporated in the periodic sewage service charge involved in *Regents II, supra*, 148 Cal.App.3d at pages 452–453, except that there the City of Los Angeles designated and earmarked the portion of the rate intended for capital improvements. To conclude that East Bay MUD's charge is outside the scope of *San Marcos* because it is fully incorporated in a single undifferentiated water rate would be to focus on the form of the charge and disregard its purpose, contrary to the court's express directive. (*San Marcos, supra*, 42 Cal.3d at pp. 164–165.) Water service charges that account for "capital facility expenses as if they were recurring operational costs" bury "as ordinary user charges what should have been designated as capital facilities fees." (*Indian Wells, supra*, 26 Cal.4th at p. 1198.)[6]

East Bay MUD contends that interpreting the purpose test as encompassing the capital portion of its water rate "ignores longstanding distinctions between user or commodity charges, of which utility service rates are the paradigmatic example, and special capital charges imposed under a public utility's taxing or other revenue powers." The *San Marcos* court recognized the legal distinction between user fees and special assessments, as have various other California courts. (*San Marcos, supra*, 42 Cal.3d at pp. 161–162; *Rincon Del Diablo Municipal Water Dist. v. San Diego County Water Authority* (2004) 121 Cal.App.4th 813, 819 [17 Cal.Rptr.3d 666] (*Rincon*); *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 595–597 [77 Cal.Rptr.2d 752]; see also *Knox v. Orland* (1992) 4 Cal.4th 132, 141–142 [14 Cal.Rptr.2d 159, 841 P.2d 144] [describing characteristics of traditional special assessment].) The *San Marcos* court concluded that to focus exclusively upon whether the charge at issue is in the form of a special assessment or a user fee would elevate form over substance and permit localities to evade the prohibition on charging public entities special assessments. "[C]harging users rather than property owners is a factor as easily manipulated as is the method of computing the fee." (*San Marcos*, at p. 164.)

■ *San Marcos* did not ignore or abolish the generally applicable distinctions between user charges and assessments. Instead, the purpose test is a prophylactic rule designed to guard against evasion of the tax exemption by collection of funds for capital improvements through charges that do not look

---

[6] The Regents cite various deposition excerpts in which East Bay MUD employees opine that the district's water rates meet the definition of capital facilities fee under the San Marcos Legislation or special assessment under *San Marcos*. East Bay MUD contends that the admissions are inadmissible. We do not rely on them.

like traditional special assessments. (Cf. *Sacramento Mun. Utility Dist. v. County of Sonoma* (1991) 235 Cal.App.3d 726, 735–736 [1 Cal.Rptr.2d 99] [following *San Marcos* in concluding that tax on *use* of public property was an invalid attempt to evade the property tax exemption].) Fees like those involved in *San Marcos* are "in effect special assessments from which public entities are exempt." (*Sacramento Mun. Utility Dist. v. County of Sonoma,* at p. 735.)

In *Richmond, supra,* 32 Cal.4th 409, the Supreme Court confirmed that the definition of assessment in *San Marcos* is inapplicable outside the context of the public entity property tax exemption. The court rejected an attempt to import that definition of "assessment" into the Proposition 218 context, stating, "In deciding what constituted an assessment in *San Marcos,* we sought to determine and effectuate the constitutional purpose for exempting public entities from property taxes, a purpose that plays no role in interpreting the provisions of article XIII D that are at issue here." (*Richmond,* at p. 422.) *Richmond* characterized the *San Marcos* holding as a determination that the fee at issue "should be considered an assessment *for purposes of the public entity property tax exemption.*" (*Richmond,* at p. 422, italics added.)

We also reject East Bay MUD's contention that the capital portion of its water rate cannot be considered an assessment under *San Marcos* because the charge was imposed by a utility acting in a proprietary capacity rather than in an exercise of the taxing power. The charge in *San Marcos* was imposed through a water district ordinance (*San Marcos, supra,* 42 Cal.3d at p. 159) and the charge at issue here was imposed through a water district rate-setting resolution. The cases relied on by East Bay MUD hold that a city acts in a proprietary capacity in " 'administering a public utility.' " (*County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 161 [161 Cal.Rptr. 172, 604 P.2d 566]; see *South Pasadena v. Pasadena Land etc. Co.* (1908) 152 Cal. 579, 593 [93 P. 490].) That proposition does not provide a basis for distinguishing between the imposition of charges in this case and in *San Marcos.* Moreover, in light of the court's intent to prevent evasion of the public entity tax exemption, we cannot conclude that shifting the charge from an ordinance to a rate-setting resolution would remove it from the scope of the *San Marcos* prophylactic rule.

Finally, East Bay MUD contends that water utilities have historically funded their capital costs with revenues received from their regular water rates. California courts have acknowledged this practice. (See, e.g., *Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172, 1182–1183 [233 Cal.Rptr. 22, 729 P.2d 186]; *Rincon, supra,* 121 Cal.App.4th at p. 819, citing *Hansen*; *American Microsystems, Inc. v. City of Santa Clara* (1982) 137 Cal.App.3d 1037, 1043 [187 Cal.Rptr. 550].) However, our interpretation of *San Marcos*

and the resulting legislation is not inconsistent with the practice of recouping capital costs through user fees. *San Marcos* does not prohibit utilities from charging private customers for capital costs in water rates: "Our conclusion does not mean that the water district cannot collect money for capital improvements from its customers; it simply means that the *private* customers will pay the entire cost of capital improvements. Public entities, such as the school district, will not be required to allocate their limited tax revenues to pay for capital improvements built by the sewer district." (*San Marcos, supra,* 42 Cal.3d at p. 158.) Even more to the point, the San Marcos Legislation *authorizes* imposition of the charges on public entities, subject to certain limitations where the public entity is a state agency or an educational institution. (§ 54999.3.)

### C. *The* Rincon *Decision*

East Bay MUD contends that its construction of the San Marcos Legislation as inapplicable to user fees is supported by the fact that section 54999.1, subdivision (b) includes the phrase "capacity charge" as an equivalent of "capital facilities fee." The Fourth District recently interpreted "capacity charge" as used in section 66013 as inapplicable to the capital portion of a regular water rate. (*Rincon, supra,* 121 Cal.App.4th at p. 819.)[7] East Bay MUD urges that we follow *Rincon. Rincon* is distinguishable.

In *Rincon,* a group of water districts sought to invalidate the portion of the San Diego County Water Authority's rate ordinance setting the transportation rate, a component of the water rate. (*Rincon, supra,* 121 Cal.App.4th at p. 815.) The districts obtained wholesale water service from the authority; the transportation rate captured the capital costs as well as the operating and maintenance costs of the authority's aqueduct system. (*Id.* at p. 816.) The districts contended that the capital portion of the transportation rate was an unreasonable capacity charge under section 66013, which provides that fees for capacity charges shall not exceed the estimated reasonable cost of providing the service. (*Rincon,* at pp. 815, 818.) The statute defines a capacity charge as "a charge for facilities in existence at the time a charge is imposed or charges for new facilities to be constructed in the future that are of benefit to the person or property being charged." (§ 66013, subd. (b)(3).)

The *Rincon* court rejected the districts' contention. The court concluded that the water rate was a user charge rather than a special assessment or capacity charge. "Under California case law, water rates are considered user or commodity charges because they are based on the actual consumption of

---

[7] Former section 59991 (now section 66013) was adopted before the San Marcos Legislation.

water. [Citations.] User rates are functionally distinct from special assessments, which are compulsory charges levied against certain properties for public improvements that directly or indirectly benefit the property owner and are not related to the use of the public improvement. [Citations.]" (*Rincon, supra,* 121 Cal.App.4th at p. 819.) The court further concluded that the legislative history of section 66013 did not support the broad interpretation urged by the water districts. (*Rincon,* at p. 820.)

*Rincon, supra,* 121 Cal.App.4th 813, is distinguished by the different definitions of "capacity charge" and "capital facilities fee" in the statutes at issue. Section 66013, subdivision (b)(3) defines a capacity charge as "a charge for facilities . . . that are of benefit to the person or property being charged," while section 54999.1, subdivision (b) provides that " '[c]apital facilities fee' or 'capacity charge' means *any* nondiscriminatory charge to pay the capital cost of a public utility facility." (Italics added.) As we observed earlier, the use of the modifier "any" indicates that we should interpret the phrase at issue broadly and in a manner that does not render surplusage the Legislature's use of the modifier. (*Delaney v. Superior Court, supra,* 50 Cal.3d at p. 798; *Indian Wells, supra,* 26 Cal.4th at p. 1191.) As the definition in section 66013 does not include the modifier "any," the statutory language was amenable to the *Rincon* court's narrow construction.

Furthermore, the *Rincon* court was not obligated to consider the *San Marcos* decision in construing section 66013. The claim in *Rincon* was that the transportation rate was an unreasonable capacity charge under section 66013; that claim was entirely unrelated to the constitutional public entity property tax exemption at issue in the *San Marcos* case. (*Rincon, supra,* 121 Cal.App.4th at p. 821, citing *Richmond, supra,* 32 Cal.4th at p. 422.) In that " 'strikingly different context,' " the *San Marcos* purpose test was irrelevant to the determination of whether the transportation rate was a capacity charge. (*Rincon,* at p. 821, quoting *Richmond,* at p. 422.) In contrast, we must follow the *San Marcos* decision in construing "capital facilities fee" as used in the San Marcos Legislation. As explained earlier, the San Marcos Legislation was specifically enacted to authorize the types of charges prohibited by the *San Marcos* decision. In effect, the Legislature authorized those charges which otherwise would be prohibited special assessments under the *San Marcos* purpose test. Because the *Rincon* court regarded the *San Marcos* decision as irrelevant to its construction of section 66013, the *Rincon* decision is inapposite to our construction of section 54999.1.[8]

---

[8] The *Rincon* court also stated that an interpretation of the *San Marcos* purpose test that encompasses user fees "ignores the traditional distinctions between different types of governmental revenue." (*Rincon, supra,* 121 Cal.App.4th at p. 821.) We disagree. The *San Marcos*

We recognize that the Supreme Court in *Indian Wells* concluded that the section 66013 definition of "capacity charge" encompasses fees deemed special assessments under the *San Marcos* purpose test, for purposes of the 120-day statute of limitations applicable to charges subject to section 66013. (*Indian Wells, supra*, 26 Cal.4th at pp. 1192–1193; see also *Utility Cost Management v. East Bay Mun. Utility Dist., supra*, 79 Cal.App.4th at pp. 1248–1249 [similar conclusion].) However, *Indian Wells* was decided before *Rincon*, so the court was not confronted with a definition of section 66013 "capacity charge" excluding charges contained in user fees. (See *People v. Banks* (1993) 6 Cal.4th 926, 945 [25 Cal.Rptr.2d 524, 863 P.2d 769] [it is well settled that appellate decisions must be understood in the light of the facts and the issues before the court, and an opinion is not authority for a proposition not considered].) In fact, the charges at issue in *Indian Wells* are similar to the charges here. There, the water district allegedly "improperly accounted for some or all of its capital facility expenses as if they were recurring operational costs, and thus 'buried' as ordinary user charges what should have been designated as capital facilities fees." (*Indian Wells*, at p. 1198.) *Rincon* excludes capital charges incorporated into user fees from the scope of section 66013, but *Indian Wells* held that such charges were subject to section 66013. In any event, the *Indian Wells* conclusion that section 54999 capital facility fees are subject to section 66013 cannot be read as requiring that we follow the *Rincon* court's *subsequent* construction of section 66013's "capacity charge" as excluding user fees. We are bound to follow the definition of capital facilities fee set forth in the San Marcos Legislation rather than following *Rincon*'s construction of the different definition set forth in section 66013. (See *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166] ["If the Legislature has provided an express definition of a term, that definition ordinarily is binding on the courts"].)

Finally, the *Rincon* court observed that using a broad purpose test in determining whether a fee is a capacity charge within the meaning of section 66013 would lead to an unreasonably expansive application of the statute. "Under [plaintiffs'] interpretation [of *San Marcos*], the sole criteria for determining whether a fee is a capacity charge is whether some portion of the revenue from that fee is expended on capital facility costs. Because most public agencies spend some portion of their funds to pay facility costs, at least a portion of every fee, charge, special assessment and many other taxes imposed by most agencies would be a capacity charge, including parking fees, recreational fees, and rental fees. It is not reasonable to assume the

court expressly recognized the distinctions between user fees and assessments; it instructed that the external trappings of a user fee (the form) do not control in the tax exemption context if the funds are being used for capital improvements.

Legislature intended its definition of capacity charge to abolish the distinctions among the various types of governmental revenue sources, each of which is governed by its own statutory scheme." (*Rincon, supra,* 121 Cal.App.4th at p. 821.) We decline to adopt that reasoning in interpreting section 54999.1. In the instant case we are compelled to follow the plain language in *San Marcos* and the resulting legislation. (See *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist., supra,* 14 Cal.4th at p. 633.)[9]

### III. *Does the San Marcos Legislation Authorize a Refund Remedy?*

East Bay MUD contends that if its FY 2002 water rate exceeds the amount permitted by the San Marcos Legislation, the only remedy is invalidation of the rate. We conclude that section 54999.4 authorizes a refund remedy.

Section 54999.4 provides in pertinent part, "Any capital facilities fees paid prior to March 24, 1988, and not protested or challenged pursuant to law on or before January 1, 1987, shall not be subject to refund, except for capital facilities fees paid after July 21, 1986, by a public agency subject to section 54999.3 that are in excess of the maximum amount authorized by sections 54999.3 and 54999.35." East Bay MUD contends that this section merely provides a right to a refund for a narrow class of claims arising from fees paid after July 21, 1986 (the date of the *San Marcos* decision) and before March 24, 1988 (the effective date of the legislation).[10] The Regents contend that the section prospectively authorizes refunds for overcharges after July 21, 1986, and that the Legislature limited refunds only for those fees paid before the statute's effective date. The Regents rely on the Supreme Court language in *Indian Wells, supra,* 26 Cal.4th at page 1190, that "[S]ection 54999.4 strictly limits refund actions for recouping fees paid prior to the effective date of the legislation, which was March 24, 1988."

Both parties proffer reasonable constructions of section 54999.4's convoluted wording, demonstrating that the section is ambiguous. (*San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 601 [51 Cal.Rptr.2d 897] [a statute is ambiguous if it is susceptible to more than one reasonable construction].) Fortunately, in deciding whether section 54999.4 authorizes a refund remedy, we are not working on a blank slate. In *Utility Cost Management v. East Bay Mun. Utility Dist., supra,* 79 Cal.App.4th 1242, this court held that a 120-day statute of limitations applies to actions

---

[9] The instant case involves a water rate with an ascertainable portion modified annually to meet the District's capital expense requirements. We do not decide whether the outcome would be the same were we to examine a fee lacking an ascertainable capital portion. In those circumstances it might be difficult to conclude that a portion of the fee was for the purpose of capital improvements.

[10] Even read narrowly the statute also authorizes refund actions for fees "protested or challenged pursuant to law on or before January 1, 1987." (§ 54999.4.)

brought under the San Marcos Legislation. "The San Marcos Legislation . . . authorized certain types of refund actions. As pertinent here, section 54999.4 authorized school districts to seek a refund of 'capital facilities fees paid after July 21, 1986 . . . which are in excess of the maximum amount authorized by Section 54999.3.' " (*Utility Cost Management v. East Bay Mun. Utility Dist.*, at p. 1247; see also *id.* at p. 1251.) We emphasized that "it is critical that these types of refund actions be subject to a short statute of limitation so that local agencies can make spending decisions confident in the knowledge that they are spending funds that are, in fact, available." (*Id.* at p. 1252.)

We filed our decision in *Utility Cost Management v. East Bay Mun. Utility Dist.* on April 17, 2000. At that time, Assembly Bill No. 1674 (1999–2000 Reg. Sess.) (Bill No. 1674) was pending in the Legislature; the bill was subsequently passed and chaptered on July 21, 2000. Bill No. 1674 added section 54999.35 to the Government Code. Section 54999.35 provides, inter alia, limitations on capital facilities fees charged by electric utilities. Section 54999.35, subdivision (b)(6) provides that any action to challenge a rate containing a capital facilities fee "or to seek a refund of any capital facilities fee" shall be commenced within 120 days. Bill No. 1674 also amended section 54999.4.

█ " 'When a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute.' " (*People v. Ledesma* (1997) 16 Cal.4th 90, 100–101 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) We conclude that the Legislature implicitly ratified the *Utility Cost Management v. East Bay Mun. Utility Dist.* interpretation of section 54999.4 as authorizing refund actions. (See *Indian Wells, supra,* 26 Cal.4th at p. 1192.) Before the passage of Bill No. 1674, *Utility Cost Management* construed section 54999.4 as prospectively authorizing refund actions for overcharges under section 54999.3. The Legislature then amended section 54999.4, adding a cross-reference to section 54999.35, authorizing refund actions for overcharges under section 54999.35. The Legislature made no attempt to limit the accepted availability of refunds for overcharges under section 54999.3, and the reference to section 54999.35 suggests that refunds are equally available under both sections.

The legislative history supports the conclusion that refund actions are authorized. The very first analysis of Bill No. 1674 states that existing law authorizes refunds of excessive fees. (Assem. Com. on Utilities and Commerce, Analysis of Bill No. 1674, as amended Jan. 3, 2000, p. 1.) The final legislative analysis before passage of the bill in the Assembly states that existing law authorizes the imposition of capital facilities fee and that "[f]ees

in excess of a specified amount are refundable." (Assem. Com. on Utilities and Commerce, Conc. in Sen. Amends., Bill No. 1674, as amended June 21, 2000, p. 2.) The analysis references court actions seeking refunds: "Existing law requires judicial challenges to ratemaking decisions by municipal water and sewer utilities to be commenced within 120-days of the effective date. This bill would extend the 120-day limit to include municipal electric utilities. [¶] In recent years, several school districts have filed suits seeking refunds of rates approved many years earlier. The 120-day limit contained in this bill would prevent entities from seeking legal remedies after the statute of limitations has passed." (*Ibid.*)

Likewise, the final analysis before passage of the bill in the Senate supports our conclusion: "Recent court challenges to capital facilities fees and other utility rates charged by public utility agencies . . . provide the background for this bill . . . [¶] . . . [¶] [t]he lawsuits recently filed attempt to recoup fees already paid by affected public agencies to public utility agencies, on the basis that the fees were unlawfully assessed because they were not agreed to by the public agency charged or that the fees were paid without knowledge of the public agency because the fees were embedded in the increased user rates." (Sen. Rules Com., 3d reading analysis of Bill No. 1674, as amended June 21, 2000, pp. 1–3.) Finally, the Legislative Counsel's Digest for Bill No. 1674 as chaptered states, "Existing law authorizes the imposition of capital facility fees . . . [but] [f]ees in excess of a specified amount are refundable." (Legis. Counsel's Dig., Bill No. 1674.)

The legislative history leaves no doubt that the Legislature was aware that the San Marcos Legislation had been interpreted as authorizing a refund remedy and that a number of past and pending suits sought such refunds. Nonetheless, the Legislature enacted section 54999.35 with a refund remedy for electric utilities and amended section 54999.4 with no changes altering the accepted refund remedy for other utilities. By its action the Legislature ratified the construction of section 54999.4 as authorizing a refund remedy; the legislative scheme relies upon a short statute of limitations to limit the exposure of utilities to claims for refunds. This interpretation of section 54999.4 was subsequently reinforced by the Supreme Court's decision in *Indian Wells, supra,* 26 Cal.4th 1185. There, in determining that refund actions are subject to a 120-day statute of limitations, the court never questioned that section 54999.4 did in fact authorize the refund action at issue. (*Indian Wells,* at pp. 1189–1193.)

Relying upon other language in *Indian Wells, supra,* 26 Cal.4th 1185, East Bay MUD contends that the exclusive remedy for enactment of a fee in violation of the San Marcos Legislation is a validation action. In *Indian*

*Wells*, the court held that actions for alleged violation of the San Marcos Legislation are subject to the 120-day statute of limitations in section 66022, part of the Mitigation Fee Act. (*Indian Wells,* at pp. 1191–1193.) East Bay MUD contends that such actions must also be subject to the section 66022, subdivision (b) requirement that suits under the section "shall be brought" as validation proceedings under Code of Civil Procedure section 860 et seq.

We need not decide whether the section 66022 validation action requirement applies here or whether, assuming it does, a refund claim can be joined with a validation action. The *Indian Wells* decision is clear that "to the extent there is a conflict between the two statutory schemes, the San Marcos Legislation is controlling." (*Indian Wells, supra,* 26 Cal.4th at p. 1193.) We have concluded that the refund remedy the Regents seek is authorized by section 54999.4; nothing in section 66022 can override that authorization.

### IV. *Do East Bay MUD's FY 2002 Capital Facilities Fees Violate the Price Deflator Limitation?*

The capital portion of East Bay MUD's water service charge is a capital facilities fee within the meaning of the San Marcos Legislation. Section 54999.3 authorizes East Bay MUD to charge such fees, subject to limitations when the fees are charged to state agencies and public educational institutions like the Regents. The primary limitations are the requirements that (1) the fees must defray actual construction costs of that portion of facilities actually serving a public agency, and (2) the fees may not be increased beyond the percentage increase in the "Implicit Price Deflator for State and Local Government Purchases." (§ 54999.3, subd. (a); see *Indian Wells, supra,* 26 Cal.4th at p. 1189.)

The Regents contend that East Bay MUD's capital facilities fees violate both limitations. We limit our analysis because the parties entered into the following stipulation in the trial court: "The parties agree that to the extent The Regents are entitled to a refund based on calculated overcharges, they are entitled to the higher calculated overcharge under either the Actually Serving Limitation or the Price Deflator Limitation, but not both."[11] Under the Regents' legal theories, the overcharge under the Actually Serving Limitation is $492,000, and the overcharge under the Price Deflator Limitation is $741,000.[12] Because the alleged Price Deflator Limitation overcharge is

---

[11] This stipulation presumably is due at least in part to the fact that, while the Regents paid $998,645 in water charges for capital costs in FY 2002, the combined alleged overcharges under the Price Deflator and Actually Serving Limitations are in excess of $1.2 million. The Regents cannot recover more than they paid for capital costs. Neither party contests the applicability of the stipulation in this appeal.

[12] In their briefs, the Regents assert that they are entitled to a refund in the amount of $759,000 based on the Price Deflator Limitation. That assertion assumes that East Bay MUD was not entitled to increase its fees by the percentage increase in the Implicit Price Deflator in

larger, we address that limitation first. We agree with the Regents' interpretation of the limitation and, accordingly, do not reach the parties' contentions regarding the Actually Serving Limitation.

With respect to public educational institutions and state agencies, section 54999.3, subdivision (a) provides: "Where necessary to defray the actual construction costs of that portion of a public utility facility actually serving a public agency, any public agency providing public utility service on or after July 21, 1986, may continue to charge any capital facilities fee which was imposed prior to that date on the public agency using the public utility service and was not protested or challenged pursuant to law prior to January 1, 1987, or increase that capital facility fee in an amount not to exceed the percentage increase in the Implicit Price Deflator for State and Local Government Purchases, as determined by the Department of Finance and any public agency shall pay any capital facilities fees authorized by this subdivision." According to the California Department of Finance, the Implicit Price Deflator is "used to adjust government expenditure data for the effects of inflation."[13]

The Regents contend that the Price Deflator Limitation means that a capital facilities fee must not exceed the pre-July 1986 fee adjusted for inflation with the Implicit Price Deflator. The Regents maintain that there is no authorization for any charge in excess of that amount, including any attempt to grandfather in additional charges. The Supreme Court in *Indian Wells*, *supra*, 26 Cal.4th at page 1190, characterized the Price Deflator Limitation in a manner consistent with the Regents' construction, stating that under section 54999.3, subdivisions (a) and (b), fees "may not exceed the amount charged prior to our decision in *San Marcos I* (July 21, 1986), as adjusted for inflation (unless the parties agree to a higher fee)." East Bay MUD contends that the limitation simply means that the increase from the previous rate to the next succeeding rate must not exceed the percentage increase in the Implicit Price Deflator over the same period. Under the District's construction, it does not matter whether the challenged fees exceed the pre-July 1986 fees adjusted for inflation, as long as the increase from the previous fees is not excessive.

---

fiscal year 2000 and fiscal year 2001. But the trial court concluded that it was proper to apply the Price Deflator increase in those years despite the District's settlement agreement to keep its rates frozen in those years. According to the parties' stipulation below, the trial court's conclusion on that issue would limit to $741,000 the overcharge under the Regents' construction of the Price Deflator Limitation. The Regents acknowledge the issue in a footnote, but do not argue the trial court erred. Any such argument has been waived. (Cal. Rules of Court, rule 14(a)(1)(B); *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115–1116 [75 Cal.Rptr.2d 27].)

[13] (Http://www.dof.ca.gov/HTML/FS_DATA/LatestEconData/FS_UseCPI.htm [as of July 6, 2005].)

The trial court adopted the District's construction and used the fiscal year 1999 rates as a baseline because that was the year of the last rate increase charged to the Regents. The parties stipulated that under the District's construction of the limitation, the FY 2002 rates resulted in only $47,000 in overcharges, which was the amount awarded by the trial court.[14] The parties' differing interpretations of the Price Deflator Limitation are most significant in a case such as this one, where the capital facilities fees went undisclosed for many years and the user thus had little opportunity to challenge the increases over time.

■ The statute admits more than one interpretation. Section 54999.3 refers to a fee charged before July 1986 and authorizes an increase in "that capital facility fee" not to exceed the increase in the Implicit Price Deflator. (§ 54999.3, subd. (a).) "[T]hat capital facility fee" can refer to the specific amount of the fee charged before July 1986, authorizing only increases which do not exceed that amount as adjusted for inflation. Alternatively, "that capital facility fee" can refer to the general fee category, authorizing periodic increases in that fee category not to exceed the percentage increase in the price deflator over the same period. When construing an ambiguous statute, a court may consider its apparent purpose and consider the overall scheme in which it is included. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 776 [72 Cal.Rptr.2d 624, 952 P.2d 641].) We seek to adopt a construction which will render the statute " 'reasonable, fair and harmonious with its manifest purpose.' " (*Conway v. City of Imperial Beach* (1997) 52 Cal.App.4th 78, 85 [60 Cal.Rptr.2d 402].)

■ The San Marcos Legislation was enacted to ameliorate the fiscal impact of the *San Marcos* decision on public utility service agencies by authorizing payment and collection of capital facilities fees subject to certain limitations, including section 54999.3. (§ 54999.) As a whole it reflects a compromise, authorizing with limitations fees in existence before the *San Marcos, supra,* 42 Cal.3d 154, decision. The plain purpose of the Price Deflator Limitation was to restrict the rate of increase in authorized capital facilities fees. Without the limitation, there would be nothing to prevent a utility from dramatically increasing the amount of its pre-*San Marcos* fees. Under the San Marcos Legislation, a public utility may impose a new capital facilities fee or increase a preexisting fee in excess of the Price Deflator Limitation only "after agreement has been reached between the two agencies through negotiations entered into by both parties." (§ 54999.3, subd. (b).) Also, presumably in order to ensure that any unnegotiated fee increases are proper, the statute obligates utilities to identify and justify the amount of a capital facilities fee upon increase of the fee. (§ 54999.3, subd. (c).)

---

[14] The $47,000 award was also based on the trial court's conclusion that it was proper to apply the Price Deflator increase in fiscal year 2000 and fiscal year 2001.

East Bay MUD's construction of the Price Deflator Limitation, focusing exclusively on the percentage increase in the Price Deflator since the last rate change, results in some consequences not intended by the Legislature. Its construction is detrimental to a utility whose periodic fee increases have not kept pace with inflation. That utility could never increase its fees to the full amount of the pre-*San Marcos* fees as adjusted for inflation with the Implicit Price Deflator. Instead, the utility could only increase its fees by the percentage increase in the Price Deflator since the last change in the fees. A utility that did not regularly increase its fees by the increase in the Price Deflator would forfeit the opportunity to account for the inflation over that period. The District's construction would have similarly devastating consequences for a utility which significantly decreased the amount of its fees in a particular year, because it could only increase its fees from the new, significantly lower baseline. Conversely, East Bay MUD's construction would benefit utilities that have exceeded the Price Deflator increase in past years and seek to maintain their relatively higher fee levels. There is no indication that the Legislature intended to protect utilities that have increased their fees in excess of the rate of inflation, nor to disadvantage utilities that have not increased their fees apace with inflation or that have decreased their fees in a given year.

 East Bay MUD argues that its construction of the Price Deflator Limitation comports with legislative intent in subjecting actions under the San Marcos Legislation to a short statute of limitations. We are not persuaded by this argument. The 120-day statute of limitations ensures that "local agencies can make spending decisions confident in the knowledge that they are spending funds that are, in fact, available." (*Utility Cost Management v. East Bay Mun. Utility Dist.*, supra, 79 Cal.App.4th at p. 1252.) "The purpose of such a short statute of limitations is to enhance the budgetary stability of public utilities, by promptly informing them of any challenges to their ability to charge and collect capital facilities fees." (*Regents of University of California v. City and County of San Francisco* (2004) 115 Cal.App.4th 1109, 1111 [9 Cal.Rptr.3d 728].) The Regents' construction of the Price Deflator Limitation does not undermine this interest in budgetary stability: utilities will be promptly informed of any challenges to their capital facilities fees. What East Bay MUD seeks is maintenance of its revenue streams from year to year, which is a different sort of financial stability than that protected by the statute of limitations here.

Finally, East Bay MUD contends that the Regents' construction of the Price Deflator Limitation would permit a collateral attack on its unchallenged rates between 1987 and 1999, despite the statute of limitations bar to challenges to those rates. The District cites various cases under the San Marcos Legislation and Mitigation Fee Act. Those cases are inapposite.

Plaintiffs there sought refunds of overcharges despite their failure to challenge the applicable rates or fees at the time of enactment. Here, the Regents challenged the FY 2002 rate increase in a timely manner. Further, in the cited cases, the claims depended upon a determination of the validity of the unchallenged rates or fees. (See *Indian Wells, supra,* 26 Cal.4th at pp. 1194–1196; *Regents of University of California v. City and County of San Francisco, supra,* 115 Cal.App.4th at pp. 1115–1116; *Utility Cost Management v. East Bay Mun. Utility Dist., supra,* 79 Cal.App.4th at pp. 1250–1253; *N. T. Hill Inc. v. City of Fresno* (1999) 72 Cal.App.4th 977, 994–995 [85 Cal.Rptr.2d 562]; *Trend Homes, Inc. v. Central Unified School Dist.* (1990) 220 Cal.App.3d 102, 110 [269 Cal.Rptr. 349].) Here, the Regents' construction of the Price Deflator Limitation does not require us to declare the rates in past years invalid because the Regents do not seek a refund of overcharges in past years. (Cf. *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 24–26 [32 Cal.Rptr.2d 244, 876 P.2d 1043] [plaintiff's taking claim untimely because to award relief court would have to determine validity of unchallenged ordinance].) The Regents' claim depends only on a determination of the validity of the FY 2002 fees. Of course, the FY 2002 fees would not be as high as they are if there had not been past increases exceeding the rate of increase in the Implicit Price Deflator, but that does not mean that we have to determine the validity of those past increases in order to provide the relief the Regents request.[15]

In conclusion, the San Marcos Legislation reflects an intent to ensure that utilities can continue charging pre-*San Marcos* fees with increases not exceeding the increases in the Implicit Price Deflator. But nothing in the statute or the cases interpreting it reveals an intent to protect post-*San Marcos* fees far in excess of the inflation-adjusted pre-*San Marcos* fees, simply because a utility was previously able to impose the fees without challenge. The Legislature contemplated a notification process and continual scrutiny of rate increases over time. (§ 54999.3, subd. (c).) To accept the District's arguments would countenance avoidance of statutory duties and undermine the Legislature's goal of controlling the rate of growth in fees. Accordingly, we construe the Price Deflator Limitation in section 54999.3, subdivision (a) as permitting any otherwise authorized increase to a capital facilities fee, as long as the new fee does not exceed the pre-July 21, 1986 fee as adjusted for inflation using the Implicit Price Deflator. If this construction of the limitation unduly restricts the ability of utilities to collect capital facilities fees from state agencies and public educational institutions, that is a matter properly addressed to the Legislature.

---

[15] Because this action is not directly or indirectly a collateral attack on East Bay MUD's previous fees, we reject the District's arguments that the action is collaterally estopped by the section 66022 validation remedy or precluded by the Regents' release of claims regarding the fiscal year 1999 rates in the 1999 settlement agreement.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The case is remanded with instructions to enter a new judgment in favor of the Regents in the stipulated sum of $741,000 and interest thereon. Costs on appeal are awarded to the Regents.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied August 3, 2005, and the petition of appellant East Bay Municipal Utility District for review by the Supreme Court was denied October 26, 2005.